[No. F018862. Fifth Dist. July 26, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILLIP PATINO, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

1738

## COUNSEL

James F. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Karen L. Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

## CORNELL, J.*—

### Introduction

Appellant Phillip Patino was convicted of two counts of forcefully committing lewd and lascivious acts on a child under the age of 14 in violation of Penal Code section 288, subdivision (b). He was also convicted of two counts of false imprisonment in violation of Penal Code section 236, and one count of forcible oral copulation in violation of Penal Code section 288a, subdivision (c). Appellant also admitted the truth of three prior convictions pursuant to Penal Code section 667, subdivision (a), and three prior convictions pursuant to Penal Code section 667.5, subdivision (b). Appellant's total sentence was 36 years.

We are asked to consider appellant's contentions that the admission of expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) violated evidentiary procedural rules and appellant's constitutional rights to confrontation and due process. For the reasons discussed hereafter, we will affirm the decision of the trial court.

### Factual Background

At the time of trial, the victim, Dorena F., was 12 years old. She was 11 years old at the time of the incidents in question. She was living with her foster mother, Anne W.

Appellant lived in a house just down the street from Anne and Dorena. On Saturday, September 21, 1991, Dorena's foster cousin, James C., who was living with Dorena's family at the time, asked Dorena to go to appellant's house to deliver a message.

Dorena went to appellant's house and knocked on the door. Appellant invited her in and shut the door. Appellant walked away from Dorena for a few minutes. When he returned, Dorena delivered her message from James.

Appellant then locked the door, grabbed Dorena, threw her to a mattress and ordered her to take off her clothes. Dorena tried to move away and told appellant she would not take off her clothes. Appellant slapped her and then Dorena took off her clothes. Dorena tried to leave her underwear on.

---

*Judge of the Merced Superior Court sitting under assignment by the Chairperson of the Judicial Council.

Appellant ordered her to take those off as well and, when she refused, he hit Dorena a second time across her face. Dorena then complied with appellant's order and took off all her clothes.

Appellant ordered Dorena to lie down on the mattress. When she failed to respond to his command, appellant slapped her a third time, and she complied with his order.

Appellant then started touching Dorena all over her body, across her chest and between her legs. He began rubbing her "private part." Dorena asked appellant to stop, but he started kissing her in her private part. Appellant began licking Dorena's private part.

Appellant then stood up, unbuttoned his pants and pulled out his private part. Appellant forced Dorena to touch his private part. Appellant grabbed Dorena by the arm and told her to go ahead, that she could touch him too. Appellant told Dorena to take her hands and move his private part up and down. She complied for a short time and stopped. When Dorena stopped, she dressed and appellant told her not to tell anyone about what had happened. Appellant also told Dorena that if she told anyone about what happened he would "get me and my family." Dorena unlocked the door and left.

Dorena left appellant's house, ran home and delivered appellant's message to James. She then went to the bathroom where she cried and took a bath. She did not tell anyone about what had happened because she was afraid of appellant's threat. She was sore from appellant hitting her.

The next day James asked Dorena to go over to appellant's house and deliver another message. When Dorena knocked on appellant's door, he asked her into his home. Appellant was alone. Dorena was frightened. She gave appellant James's message.

Appellant came up behind Dorena quickly, closed the door and locked it. He grabbed Dorena and pushed her down on the mattress. Appellant ordered Dorena to take off her clothes. When Dorena did not comply with appellant's order, he hit her across the face. This time his strike was harder than the day before. Dorena then took off her clothes.

Appellant ordered Dorena to lie down. When she did not do so at first, appellant struck her again. She complied with his order and he started touching Dorena again. He touched her chest and tried to kiss her. Appellant touched Dorena's hand and kissed her chest.

There was a noise which startled appellant. Dorena thought the noise was a ringing telephone. Appellant got up, looked out the window and went to a

back room. Dorena jumped up, dressed, and left. When she returned home, she communicated appellant's response to James. She did not tell James what had happened because she was still afraid of appellant and his earlier threat.

Dorena testified that a couple of weeks later she wrote an unsigned letter to Officer Frank Wooldridge, a D.A.R.E. officer at school. D.A.R.E. is an acronym for Drug Abuse Resistance Education program. It is a structured curriculum in schools run by the police department. The purpose of the program is to teach students the skills necessary to resist the pressures to use drugs and alcohol. In her letter, Dorena explained what had happened to her and placed her note in the D.A.R.E. box. She still had not told her family what had happened.

The sheriff's department was initially notified of the case on September 27, 1991. The case was assigned to Deputy Alan Hall three days later. Deputy Hall was the first officer to interview Dorena.

Dr. Jess Diamond was called as a prosecution witness to testify as an expert on the subject of CSAAS.[1] The defense stipulated that Dr. Diamond was a qualified expert on CSAAS. Dr. Diamond had examined thousands of molested children during the preceding 10 years.

Dr. Diamond testified there were five stages involved in CSAAS which were: secrecy, helplessness, accommodation, disclosure, and reaction. Dr. Diamond explained that not every child who has been molested shows these five stages of behavior, but the failure to show these behaviors does not mean the individual had not been molested. The syndrome usually does not apply to someone who is a perfect stranger. It usually applies where the molester is a relative or a friend and can apply to one who knows a child only briefly.

Dr. Diamond testified a child may never report an incident of abuse or may delay reporting abuse because children will only disclose molestation if they feel they are in a safe environment or they think they will be believed. Where a child has been threatened and told not to tell anyone, or where the child has been told that he or she or a family member will be hurt, the child often delays in revealing the molestation.

CSAAS can also account for a child going back into a situation where he or she could be molested again. Once affected by the syndrome, a child does

---

[1]During motions *in limine*, defense counsel objected to Dr. Diamond's testimony concerning CSAAS.

not reveal the molestation to anyone for whatever reason. When the child is asked to go back into the molester's environment, the child is often afraid to show fear because fear would arouse suspicion. Therefore, the child will go back into the dangerous environment again rather than try to explain why he or she does not want to go back.

The syndrome also accounts for the disclosure in stages of details concerning the molestation. According to CSAAS theory, a child reveals more details as time passes and as the child begins to relax and feel more secure with the person to whom he or she is confiding.

Dr. Jay Fisher testified for the defense. He has a Ph.D. in critical psychology and specializes in working with physically and sexually abused children. Dr. Fisher testified improper interview techniques used by an untrained person could result in tainted answers and false accusations. He also testified false accusations concerning sexual molestation were not uncommon in custody disputes and foster care situations.

Dr. Fisher testified once a child provides a given set of facts about events that allegedly occurred, then, even if the facts are proven later to be false, they become immune to extinction as the child is interviewed by others. The child begins to reconstruct events rather than have a true memory of an event.

Appellant also testified. Appellant knew the victim was a neighbor. Before the incidents in question, appellant had been to the victim's home to visit with James. On one occasion before the incidents, the victim had visited appellant's house with James.

Appellant testified that on one occasion, the incident in question, Dorena followed him home and started talking to him. Dorena followed appellant inside and told him she liked him. Appellant claimed Dorena followed him into the back room where she told him she wanted him "to do it to her." Appellant understood this statement to mean that Dorena wanted to have sex with him.

Appellant claimed Dorena pulled her shorts down and lay down on the mattress and spread her legs. Appellant explained he asked Dorena if she really wanted to have sex but he then remembered James said he was going to come over shortly. Appellant was afraid James would think he was trying to seduce Dorena. Appellant claimed he walked into the living room and took a look over toward the victim's house. When he returned to the back room, Dorena was pulling her shorts back on. Dorena allegedly told appellant that she still wanted "to do it" to him.

Appellant denied touching Dorena, putting his face between her legs, touching her vagina with his tongue, or touching her breasts, chest or any other part of her body.

DISCUSSION

I.

*Admissibility of CSAAS Evidence*

Appellant contends it was prejudicial for the trial court to admit CSAAS evidence over his trial counsel's *in limine* objection to such testimony. Appellant argues the trial court did not properly wait for defense counsel to cross-examine and impeach the complaining witness on areas relevant to CSAAS before permitting such testimony by the prosecution's expert, Dr. Jess Diamond.

Appellant argues he was prejudiced by the introduction of CSAAS testimony because it bolstered the victim's version and diminished appellant's case and his testimony of the events. Appellant finally contends introduction of CSAAS testimony violated his constitutional rights to confront witnesses and to due process.

■ It is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred. It can be highly prejudicial if not properly handled by the trial court. It is unusual evidence in that it is expert testimony designed to explain the state of mind of a complaining witness. The particular aspects of CSAAS are as consistent with false testimony as with true testimony. For these reasons, the admissibility of such testimony must be handled carefully by the trial court. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 391, 393 [249 Cal.Rptr. 886]; see *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291].)

Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 [283 Cal.Rptr. 382, 812 P.2d 563]; *People v. Bowker, supra,* 203 Cal.App.3d at p. 391.)

Identifying a "myth" or "misconception" has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a

delay in reporting a molestation. (*People* v. *Harlan* (1990) 222 Cal.App.3d 439, 449-450 [271 Cal.Rptr. 653]; *People* v. *Sanchez* (1989) 208 Cal.App.3d 721, 735-736 [256 Cal.Rptr. 446].)

Admission of evidence such as CSAAS is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal. The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility. (*People* v. *Bergschneider* (1989) 211 Cal.App.3d 144, 159-160 [259 Cal.Rptr. 219]; *People* v. *Sanchez, supra,* 208 Cal.App.3d at pp. 735-736.)

Dr. Diamond's testimony was offered for the limited purpose of explaining why Dorena did not immediately inform anyone of her molestation and why she slowly revealed the details of the molestation. Furthermore, defense counsel did ask Dorena on cross-examination the length of time it took her to put a note in the D.A.R.E. box. She replied it took two weeks. Counsel also queried Dorena on cross-examination about why she returned to appellant's house the day after the first molest. Thus, the appellant did place at issue Dorena's credibility.

Denying the prosecution the opportunity to introduce CSAAS testimony as part of its case-in-chief rather than in rebuttal could lead to absurd results. Regardless of how or by whom Dorena's delay in reporting the molests was introduced to the jury, an obvious question was raised in the minds of the jurors. It would be natural for a jury to wonder why the molestation was not immediately reported if it had really occurred. In this case, the jury could further ask why Dorena went back to appellant's home a second time after the first molestation. If it were a requirement of admissibility for the defense to identify and focus on the paradoxical behavior, the defense would simply wait until closing argument before accentuating the jurors' misconceptions regarding the behavior. To eliminate the potential for such results, the prosecution should be permitted to introduce properly limited credibility evidence if the issue of a specific misconception is suggested by the evidence.

The trial court in the instant action handled the matter carefully and correctly. The jury was immediately admonished after Dr. Diamond's testimony it was to consider CSAAS testimony only for the limited purpose of showing, if it did, that the alleged victim's reactions as demonstrated by the evidence were not inconsistent with her having been molested. The jury was further admonished that the People still had the burden of proving guilt beyond a reasonable doubt, and CSAAS research was based upon "an approach that is completely different from that which you must take in this

case." The jury was told by the court that syndrome research begins with the assumption that a molestation has occurred and seeks to explain common reactions of children to that experience. Jurors, however, had to "presume the defendant innocent."

The trial court further admonished the jury through its concluding instructions CSAAS testimony was "not received and must not be considered by you as proof that the alleged victim's molestation claim is true."[2]

■ Appellant further contends his rights to cross-examine and confront witnesses, as well as his due process rights, were violated by the prosecution's use of CSAAS testimony. According to appellant, the use of CSAAS by the prosecution served to neutralize inconsistencies in Dorena's testimony and the testimony of Dorena's foster mother that she behaved normally immediately after the alleged molestations. Thus, appellant claims he has been denied meaningful confrontation and cross-examination of witnesses.

It is true the Sixth Amendment right to confront witnesses includes a right to meaningful cross-examination. In *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 308-309, 93 S.Ct. 1038], the United States Supreme Court expressly found the right to meaningful cross-examination and thus confrontation of a witness was denied under Mississippi's common law rule that did not permit a criminal defendant to impeach his own witness.

Appellant's argument, however, misconstrues the nature of CSAAS testimony. The purpose of CSAAS testimony was not to neutralize inconsistencies in the victim's testimony or in the foster mother's testimony. The primary purpose of CSAAS testimony was to show why the victim acted as she did. The testimony was introduced to explain the state of mind of the complaining witness.

---

[2]The jury was later read the following version of CALJIC No. 10.64, the cautionary instruction on child abuse syndrome:

"A witness has given testimony relating to the child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. Thus, you may consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

Appellant, unlike the defendant in *Chambers*, engaged in a lengthy cross-examination of Dorena. He explored inconsistencies in her testimony, her failure to remember the message she was bringing to appellant, her remembering there was a telephone present at appellant's home,[3] and her returning to appellant's home, as well as her delay in notifying anyone that the molestations had occurred.

The evidentiary posture of this case in no way resembles *Chambers*. Appellant was afforded an extensive opportunity to cross-examine and challenge Dorena's statements. His trial counsel did so carefully and effectively. Also, appellant called Dr. Fisher to challenge the way in which the victim was questioned by the authorities concerning the molestation. Dr. Fisher's testimony suggested that the idea of a molestation can be planted into the victim's memory by asking suggestive questions. Thus, appellant was afforded a vigorous defense challenging the victim's credibility.

Trial judges retain wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on cross-examination. The right to confrontation is not unlimited. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1219 [283 Cal.Rptr. 144, 812 P.2d 163].) The trial court in the instant action did not deprive appellant of his right to confrontation or his right to cross-examination of Dorena by permitting the use of CSAAS testimony by the prosecution.

Appellant further claims that his right to due process was violated by the introduction of CSAAS testimony. The United States Supreme Court has held the admission of relevant evidence of the battered child syndrome does not violate the due process clause of the Fourteenth Amendment. (*Estelle* v. *McGuire* (1991) 502 U.S. 62, 69-70 [116 L.Ed.2d 385, 397-398, 112 S.Ct. 475, 480-481].) Battered child syndrome evidence is analogous to CSAAS evidence. (*People* v. *Bowker, supra*, 203 Cal.App.3d at pp. 393-394.) For this reason, there can be little doubt the due process dimensions of both types of evidence is similar if not identical. Therefore, introduction of CSAAS testimony does not by itself deny appellant due process.

Finally, the essence of a due process violation is a denial of a criminal defendant's right to a fair trial. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 534 [262 Cal.Rptr. 1, 778 P.2d 129].) Appellant has failed to demonstrate how his fundamental right to a fair trial was violated by the introduction of CSAAS testimony to rehabilitate Dorena's testimony after a rigorous defense cross-examination calling into question the victim's credibility.

---

[3]The parties stipulated at the conclusion of Dr. Diamond's testimony appellant did not have a phone.

## II.

*CALJIC No. 2.90**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

DISPOSITION

The judgment is affirmed.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 16, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1737.