Filed 11/13/13  P. v. Sosa CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B241234 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA079895) |
| v. | |
| HEATH DEREK SOSA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed and remanded with directions regarding reassessment of fines, fees and penalties.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Heath Derek Sosa of two counts of continuous sexual abuse of a child under the age of 14 years and one count of committing a lewd act on a child under the age of 14 years and found true the special allegation of multiple victims. Witnesses at trial included the victims, H.A. and her older sister, S.A., who were Sosa's step-daughters; their mother, T.S; and an expert who testified about child sexual abuse accommodation syndrome (CSAAS). On appeal Sosa contends the trial court abused its discretion in admitting the expert testimony because the victims' credibility was not challenged and erred in instructing the jury on CSAAS. Sosa further contends the court erred in instructing the jury on adoptive admissions; the prosecutor committed misconduct by vouching for the credibility of the witnesses during closing argument; the 30-year-to-life portion of his state prison sentence constitutes cruel or unusual punishment; and the court erred in imposing certain fines and penalty assessments. We affirm the judgment, but remand the matter for the trial court to determine and fully describe the applicable fine and assessments.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Charges*

On February 4, 2011 Sosa was charged by information with one count of continuous sexual abuse of H.A., a child under the age of 14 years (Pen. Code., § 288.5, subd. (a)). Following accusations by S.A. six months later, Sosa was charged in a separate case with one count of continuous sexual abuse of a child under the age of 14 years and one count of committing a lewd act on a child under the age of 14 years (Pen. Code, § 288, subd. (a)). After the trial court granted the People's motion for joinder, an amended information was filed that combined the counts and specially alleged there were multiple victims within the meaning of the "One Strike Law" (Pen. Code., § 667.61, subds. (b), (e)). Sosa pleaded not guilty and denied the special allegation.

2

2. *Summary of the Evidence Presented at Trial*

   a. *The People's evidence*

Sosa and T.S. met in 1997.  Sosa had a two-month-old daughter, Kristen; and T.S.'s daughters, H.A and S.A., were two years old and five years old respectively.  After dating T.S. for several months, Sosa, T.S., H.A. and S.A. moved into a home together; Kristen lived with the family off and on over the years.  In 2003 Sosa and T.S. got married.  T.S. considered their relationship "wonderful," and she was very happy.

   i. *The sexual abuse of S.A.*

S.A., 19 years old at the time of trial, testified she had grown to love Sosa and considered him her father; all of her friends liked Sosa and thought he was a "pretty cool guy."  Toward the end of fifth grade, when she was 11 years old, however, Sosa rubbed her back and buttocks in a way that made her uncomfortable while she was watching television in her parents' bed.  S.A. felt confused and embarrassed, but did not tell anyone because she "didn't really know what to say or how to say it."

In the beginning of sixth grade Sosa, who generally left for work between 4:00 a.m. and 5:00 a.m., came into S.A.'s room around 4:30 a.m. and rubbed her breasts, buttocks and vaginal area.  He also penetrated her vagina with his fingers.  She did not say anything to Sosa because she was confused and did not want to believe it was happening.  S.A. testified she did not tell her mother because, "I liked my family, and I didn't really want to be responsible for breaking it up."  Sosa continued to come into her room in the early morning and to touch her on average once an month throughout S.A.'s sixth, seventh and eighth grade years.  Sosa used his fingers to penetrate S.A's vagina, which hurt her, about half the time.

S.A. did not tell anyone about Sosa's conduct during the years it occurred.  However, T.S. testified S.A. was crying one morning near the end of seventh grade and told T.S. she had had an awful sexual dream about Sosa the night before.  T.S. asked if she was sure it was a dream because she was so upset, and S.A. assured her it was.  T.S. hugged S.A., telling her, "[I]f something ever happens for real like that, if it is not just a dream or if you are trying to tell me something, you know that you can always come to

3

me." S.A. testified T.S.'s reaction caused her to realize T.S. would believe S.A. if she told the truth, and S.A. did not want to be responsible for breaking up the family.

S.A., who had become depressed and withdrawn in ninth grade, was prescribed antidepressants. During that same year, Sosa stopped touching her. S.A. never suspected Sosa was sexually abusing H.A., who was 11 years old when Sosa stopped sexually abusing S.A. S.A. did not tell anyone Sosa had sexually abused her after H.A. first disclosed her abuse because S.A. felt guilty she had not said anything that might have prevented Sosa from sexually abusing H.A. and was afraid her sister and mother would be angry with her. S.A. decided to reveal she had been sexually abused in August 2011 because her boyfriend, who elicited from her that she had been sexually abused too, encouraged her to do so. T.S. testified S.A. told her, "Do you remember the dream that I told you that I had? It wasn't just a dream, and it happened to me too, many times."

ii. *The sexual abuse of H.A.; H.A. tells T.S.*

H.A., 16 years old at the time of trial, testified she had had a good relationship with Sosa while she was growing up, loved him and considered him to be her father. When H.A. was 11 years old, she would occasionally sleep in bed between Sosa and T.S; sometimes they would watch a movie together and fall asleep or sometimes she would go to their bed because she was scared. One morning when she was in their bed, Sosa touched H.A.'s breasts and vagina underneath her clothing. H.A. knew it was wrong but was scared and confused and did not know what to do. For the next three years Sosa continued to touch H.A. "a lot of times" in the same manner. Sometimes T.S. was sleeping in the bed when it happened; other times she had awoken early for work or was in H.A.'s room taking care of T.S. and Sosa's infant son, C.S, who was born in 2008 and shared a room with H.A. H.A. continued getting into her parents' bed despite Sosa's conduct because she was afraid it would seem suspicious if she stopped and she did not want her mother asking about it.

Sosa stopped touching H.A. when she was in ninth grade. The day after the last incident H.A. told one of her friends, Hanna J., that Sosa had been touching her inappropriately. Hanna testified H.A. was crying and said she did not want to tell her

4

mother because she and Sosa were happy together, C.S. had just been born and H.A. did not want to ruin their happiness.[1]  Hanna told H.A. she should do what she felt was right because she did not know what to say.  H.A. testified she told other friends as well because she wanted their advice and knew her friends would keep it secret.  One of those friends, D.D., testified H.A. was conflicted about whether she should tell her mother: "She didn't want to like break up the family because her mom was really happy."  D.D. advised H.A. to do whatever she wanted.

On September 10, 2010 H.A., who was then 15 years old and in 10th grade, was having a "really bad day."  A friend gave her amphetamines to feel better, but they made her feel worse; so she took three of her sister's antidepressants.  After school H.A was waiting with Hanna for T.S. to pick them up.  H.A. was feeling "jittery" and "couldn't stop talking."  She testified, "I was like I just want to tell my mom because I don't . . . want to live like this.  Like I took these pills.  I don't know what's going on with me.  I don't want to do this anymore."  When T.S. picked up the girls, who had both been crying, H.A. told her Sosa had been touching her inappropriately.  After reassuring H.A., T.S. took her to the emergency room to make sure her physical health was not in danger because she had taken the pills.

iii.  *The text messages*

About the time T.S. picked up H.A. and Hanna, Sosa had begun trying to contact T.S. by phone and text message.  T.S. did not respond to Sosa.  However, she sent a text message to friends she and Sosa had planned to meet for dinner to tell them H.A. was sick and they had to cancel.  Sosa subsequently called the emergency room.  Although T.S. told him not to come to the hospital, he said he would and hung up.  T.S. immediately sent him a text message stating, "Don't come, Heath.  [H.A.] said that you

---

[1]      T.S. testified H.A. would come home and cry in her bed when she was in the ninth grade.  T.S. tried to comfort her and asked what was wrong, but H.A. would tell her, "Mom, I'm sorry.  This is one thing I just can't talk about."  H.A. also became disrespectful toward Sosa, which was out of character for her.  Once when Sosa was scolding H.A., T.S. told her she needed to respect Sosa.  H.A. stood up, looked at Sosa and said, "Do I?  Do I need to respect you, Heath?  Do I? "

have been touching her for years. Our whole world is gone forever. I cannot believe this. Our family is done."

After leaving the emergency room T.S. and H.A stayed at a friend's home for the evening. (S.A. was out of town.) The next day, September 11, 2010, Sosa agreed to leave the family home and let T.S. care for C.S. H.A. and T.S. returned, spending a night in the home. However, the next morning H.A. told T.S. she could not stay at the home any longer; they returned to the friend's house. Also on that day Sosa sent T.S. a text message regarding the arrangements for his visit with C.S.: "I am so sorry. Yes, I am at grandma's. . . . If you want [C.S.] back by a certain time, let me know. I will work around your schedule. I am the one that should be punished. It is really hard knowing. I want to see [C.S.] every day." A few minutes later Sosa texted: "Thank you, I am so ashamed. I know I scarred this family deep, and I will always be in pain forever." The next day he sent a text message stating in part, "[W]e need to try to figure all this out. I know it is too soon, and I made a huge mistake, but we need to work on some of these things." Later he texted, "I want to see [C.S.] this week. You shouldn't punish him for my mistake."

### iv. *Expert testimony about child sexual abuse accommodation syndrome*

Dr. Jayme Bernfeld, a clinical psychologist, testified CSAAS is a model used to explain why children who have been sexually abused do not immediately disclose the abuse or react as adults might expect they would. According to Dr. Bernfeld, "The reality is that very few children who have been sexually abused say anything. And when they do, it tends to be many years later, and disclosures tend to be very piecemeal . . . ." Dr. Bernfeld described the five elements of the model—secrecy, helplessness, accommodation, delayed disclosure and retraction. With respect to accommodation, Dr. Bernfeld explained it was not unexpected for children to return to a situation in which they have been sexually abused because they might not anticipate the abuse would happen again and, "in order to keep the secret, the privacy, a child will continue to do the same thing."

6

b. *The defense evidence*

Testifying on his own behalf, Sosa denied touching S.A. and H.A. in an inappropriate way. He did not know the reason they had accused him of sexual abuse and agreed it must have been difficult for them to testify at trial. His response to T.S.'s first message accusing him of touching H.A. was an outright denial: "What are you talking about? I would never do such a thing ever in my life."

With respect to the text messages in which he apologized, said he was ashamed and had deeply scarred the family, Sosa explained he was apologizing for wanting to see C.S. on the weekends since T.S. worked all week and was ashamed of being accused; the accusations, not any sexual abuse, had scarred the family. His references to having made a mistake was the possibility he had inadvertently wrapped his arms around H.A., thinking it was T.S., while he was sleeping.[2] He thought he should be punished because, ". . . If I did something wrong to make [H.A.] feel that way, I felt bad for her being in that—putting he in that position to where, if something was to happen where it happened, I felt bad for that . . . ." Sosa also testified about a "pretext call" T.S. had made to him that was arranged by a police detective. A recording of the call in which he denied touching H.A. inappropriately was played for the jury.

Sosa's employer, his employer's wife and a coworker testified they had spent time with Sosa and his family. They believed Sosa was honest and had never seen him act inappropriately. Sosa's daughter Kristen testified he had never touch her inappropriately and she thought he was a "really good dad."

2. *The Jury Instructions*

a. *CSAAS*

Prior to Dr. Bernfeld's testimony the court instructed the jury with a modified version of CALCRIM No. 1193: "You will hear testimony from Dr. Bernfeld regarding . . . child sexual abuse accommodation syndrome. Dr. Bernfeld's testimony about child

---

2    Sosa testified he had awakened on at least one occasion and suddenly realized his arms were completely wrapped around H.A.

7

sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [S.A. or H.A.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony."

Following the close of the evidence the jury was again instructed with a modified version of CALCRIM No. 1193: "You have [heard] the testimony of Jayme Bernfeld, Ph.D., regarding child sexual abuse accommodation syndrome. As I indicated earlier, Dr. Bernfeld's testimony about child sexual abuse accommodation syndrome was permitted for a limited purpose, and it is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [S.A. or H.A.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony."

b. *Adoptive and party admissions*

The trial court indicated it intended to instruct the jury with CALCRIM No. 357 on adoptive admissions. Defense counsel objected, arguing the instruction was inapplicable because there was no evidence of any out-of-court accusatory statements Sosa had not denied. The court overruled the objection, explaining, "The jurors will be instructed in the first instruction that it's up to them to decide what instructions apply to the case, and they'll be reminded, of course, just because the court gives an instruction, the court is not communicating anything regarding the facts. They will apply the instructions to the facts as they find them."

The jury was instructed with CALCRIM No. 357: "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether or not each of the following is true: [¶] One, the statement was made to the defendant or made in his presence. [¶] Two, the defendant heard and understood the statement. [¶] Three, the defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true. [¶] And four, the defendant could have denied it but did not. [¶] If you decide that all of these

8

requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

The jury was also instructed with CALCRIM No. 388: "You have heard evidence that the defendant made oral or written statements before the trial. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give the statements. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

3. *The Jury's Verdict and Sentencing*

The jury found Sosa guilt of two counts of continuous sexual abuse of a child under the age of 14 years and one count of committing a lewd act on a child under the age of 14 years and found true the special circumstance of multiple victims. The court sentenced Sosa to a state prison term of 32 years to life consisting of 15 years to life for the continuous sexual abuse of H.A., plus a consecutive term of 15 years to life for the continuous sexual abuse of S.A., plus two years (one-third the middle term) for committing a lewd and lascivious act on S.A. In deciding to impose the sentences consecutively, the court explained S.A. and H.A., "who were both at different times under the age of 10 when the crimes began," were "young" and "particularly vulnerable" and that Sosa had taken "advantage of a position of trust and confidence as the father figure of these two young girls." The court also found the crimes were carried out in a manner "which might indicate . . . planning and sophistication." The court imposed various fines and assessments.

**DISCUSSION**

1. *The Trial Court Properly Admitted Expert Testimony About CSAAS and Correctly Instructed the Jury*

　　a. *Admission of the testimony*

Expert testimony about CSAAS is properly admitted to describe and explain common reactions of children to molestation. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) Although it is predicated on the assumption sexual abuse has taken place, it is inadmissible to prove a molestation has in fact occurred. (See *ibid.*; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*) ["[i]t is unusual evidence in that it is expert testimony designed to explain the state of mind of a complaining witness"].) Rather, it is "admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to molestation." (*Patino*, at p. 1744.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuse who occupies a position of trust." (*Bowker*, at p. 394.)

Sosa contends the trial court abused its discretion in admitting Dr. Bernfeld's testimony about CSAAS because he did not challenge H.A. or S.A.'s credibility or put at issue any delay in reporting the abuse. To be sure, many cases approve the use of CSAAS expert testimony "to rehabilitate [a] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300; accord, *People v. Perez* (2010) 182 Cal.App.4th 231, 245.) But permissible use of such testimony is not limited to rebutting a direct, specific challenge to one of the model's elements—secrecy, helplessness, accommodation, delayed disclosure and retraction. "If it were a requirement of admissibility for the defense to identify and focus on the paradoxical behavior, the defense would simply wait until closing argument before accentuating the jurors' misconceptions regarding the behavior. To eliminate the potential for such results, the prosecution should be permitted to introduce properly

10

limited credibility evidence if the issue of a specific misconception is suggested by the evidence." (*Patino*, *supra*, 26 Cal.App.4th at p. 1745.)

As in *Patino*, in the instant case "[i]t would be natural for the jury to wonder why the molestation was not immediately reported if it had really occurred" or why H.A. would repeatedly return to Sosa and T.S.'s bed for several years if she was being molested. (*Patino*, *supra*, 26 Cal.App.4th at p. 1745.) Moreover, contrary to Sosa's contention, he did challenge S.A. and H.A.'s credibility beyond that implicit in denying he had inappropriately touched them. (See *ibid.* ["testimony is pertinent and admissible if an issue has been raised as to the victim's credibility"].) For example, Sosa's counsel asked S.A. about other conduct engaged in by Sosa that S.A. had promptly complained about to her mother—Sosa would slap S.A. on the buttocks when she walked by or come into the bathroom when she was in the shower. Sosa's counsel did not ask why S.A. had complained about that objectionable conduct and not the alleged molestation, but the implied challenge to her credibility was clear. In a similar line of questioning of H.A. during re-cross examination, defense counsel asked:

"Q: When he did stuff you didn't like, did you ever tell him you didn't like it?

"A: What do you mean?

[¶] . . . [¶]

"Q: [D]id he ever tickle you when you'd tell him to stop?

"A: Yeah.

"Q: [T]he first time that you were ever[] touched that you felt it was inappropriate and made you feel uncomfortable, did you say anything to him like, 'Knock it off. What the heck are you doing?'

"A: No, because it was not the same as tickling. There was a very big difference.

"Q: And you didn't feel you could tell him to knock it off?

"A: No, because—

11

"[Sosa's Counsel]: I have no further questions."[3]

Sosa argues H.A. and S.A.'s testimony explaining their reluctance to report the abuse was so concise and reasonable that there was no need for expert testimony to explain the delay. The fact a lay witness may be articulate and persuasive explaining his or her own personal experience is not a ground for excluding expert testimony related to that subject if it "is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Sosa cites no evidence the public has become so well informed about child molestation that expert testimony about CSAAS is no longer necessary.

### b. *The jury instruction*

Sosa contends it was error to instruct the jury it could consider Dr. Bernfeld's testimony in evaluating the credibility of H.A. and S.A.'s testimony. He argues the jury should have only been instructed it could consider that testimony in deciding whether H.A. or S.A.'s conduct was consistent with the conduct of someone who has been molested. Sosa argues the "believability" language in modified CALCRIM No. 1193, as given in this case, invited the jury to consider CSAAS testimony as evidence that he had committed the charged crimes—an impermissible use that is also in conflict with the preceding sentence in the instruction that the testimony is "not evidence that the defendant committed" any of the charged crimes. (See *People v. Housley* (1992) 6 Cal.App.4th 947, 958 [expert testimony on CSAAS "may be unusually susceptible of being misunderstood and misapplied by a jury, perhaps because the expert is commonly asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred"]; *People v. Bowker, supra,* 203 Cal.App.3d at p. 394 ["[b]eyond the tailoring of the evidence itself, the jury must be instructed simply and directly that the expert's testimony

---

3    Notwithstanding counsel's attempt to cut off H.A.'s answer, the court instructed her to complete it. H.A. explained, "Because it was just like a different kind of feeling. It wasn't—like it wasn't normal."

is not intended and should not be used to determine whether the victim's molestation claim is true"].)

Sosa's argument is wholly without merit.[4] As discussed, CSAAS testimony is admissible if an issue is raised as to the victim's credibility, as Sosa did in the instant case. Consistent with this limited admissibility, CALCRIM No. 1193 instructs the jury it may use the evidence to assesses the "believability"—that is, the credibility—of the witness. The danger the jury might misconstrue CSAAS testimony as "corroboration for the victim's claims" described by the *Housley* court is minimized by "impos[ing] upon the courts a duty to render a sua sponte instruction limiting the use of such evidence" including an admonition the testimony is not evidence the defendant committed the charged crimes. (*People v. Housley*, *supra*, 6 Cal.App.4th at p. 959; *People v. Bowker, supra,* 203 Cal.App.3d at p. 394.) There is simply no reasonable likelihood the jury misunderstood the instruction and interpreted the expert testimony as indicating the charged abuse had actually occurred.

2. *The Trial Court Properly Instructed the Jury on Adoptive Admissions*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case (*People v. Blair* (2005) 36 Cal.4th 686, 745), that is, "''''those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.''''" (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to

_____

4      We review claims of instructional error de novo to determine whether the instruction accurately stated the law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210; *People v. Alvarez* (1996) 14 Cal.4th 155, 217-218.) When the instruction is challenged as ambiguous and subject to an erroneous interpretation by the jury, we examine the record to determine whether there is a reasonable likelihood the jury understood the instruction in the manner asserted by the defendant. (*People v. Cross* (2008) 45 Cal.4th 58, 67-68; *People v. Clair* (1992) 2 Cal.4th 629, 663.)

13

determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.'"" (*People v. Jablonski* (2006) 37 Cal.4th 774, 831; see *Guiton*, at p. 1130 [error in giving instruction that has no application to facts reviewed under harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818].) Sosa contends the evidence did not support giving the instruction on adoptive admissions because there was no clear indication which out-of-court accusatory statements he purportedly adopted by failing to deny them.

Generally, "[a] statement by someone other than the defendant is admissible as an adoptive admission if the defendant 'with knowledge of the content thereof, has by words or other conduct manifested his adoption [of] or his belief in its truth.' [Citations.] [¶] In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535.)

Most of Sosa's incriminating text messages are more aptly characterized as party admissions, rather than adoptive admissions, admissible under Evidence Code section 1220. They were direct statements by Sosa that he was ashamed, had made a huge mistake and scarred the family deeply and was the one who should be punished. As discussed, the jury was properly instructed with CALCRIM No. 388 regarding the use of those statements. At least one text message, however, presented "sufficient evidence of an adoptive admission"; thus, whether Sosa's "conduct actually constituted an adoptive admission [became] a question for the jury to decide." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.) After a conversation between T.S. and Kristen, T.S. texted Sosa, "Why are you allowing your family to blame me, [Kristen's mother], and our children? You need to tell them what you did, Heath." She immediately texted him again, "It should come from you. They don't need to hear this from somebody else." Sosa responded, "I know that, I really do. We just want to know how they are doing." By

14

failing to deny he had done anything blameworthy, the jury reasonably could have found Sosa adopted T.S.'s statement clearly implying he had molested H.A.

Even if we were to accept Sosa's contention the instruction was not supported by the evidence, however, there is no reasonable likelihood the jury applied it in a manner that violated his rights. By its express terms CALCRIM No. 357 applied only if the jury concluded Sosa had failed to deny an accusation of criminal misconduct made directly to him or in his presence. If any of the requirements for an adoptive admission were not satisfied, the jury was instructed not to consider the statement or Sosa's response "for any purpose." In addition, the trial court instructed the jury, "[S]ome of these instructions may not apply, depending on your finding about the facts of the case. Do not assume that, just because I give a particular instruction, that I am suggesting anything at all about the facts." There is no reason to believe CALCRIM No. 357 had any impact on the findings of guilt if the jury concluded the evidence did not support a finding of adoptive admission. An instruction correctly stating a principle of law but not applicable to the facts of the case is usually harmless, having little or no effect "other than to add to the bulk of the charge." (*People v. Sanchez* (1947) 30 Cal.2d 560, 573.)

3. *There Was No Prosecutorial Misconduct*

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution only when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Navarette* (2003) 30 Cal.4th 458, 506; accord, *People v. Morales* (2001) 25 Cal.4th 34, 44.)

15

Sosa contends the prosecutor committed misconduct because she stated several times during closing argument S.A., H.A. and other witnesses were telling the truth.[5]  For example, when arguing it was not reasonable H.A. and S.A. were mistaken about the abuse, the prosecutor described all of the adverse consequences the girls had experienced as a result of the accusations and said, "Why?  Because they finally had to come to terms with the truth, the awful truth of what the defendant had been doing to them, and they couldn't lie any longer."  After explaining the testimony of a single witness was sufficient to prove a fact, the prosecutor said, "And I submit to you ladies and gentleman, that those little girls, S.A. and H.A., sat up there and told to you, in explicit detail what the defendant did to them.  And there has been no evidence presented of why they would do it for any reason other than it was the horrible truth."  When discussing S.A.'s disclosure of the abuse to her boyfriend, the prosecutor argued, "Her crying when he confronted her, 'He did it to you, too, didn't he?'  Her crying and breaking down was all the answer that [the boyfriend] needed.  He knew the truth."

"A 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.  [Citations.]  Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial.  [Citation.]  However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper

_____

5    Sosa's counsel did not object to the prosecutor's allegedly improper comments, nor did he request an admonition or curative instruction.  Accordingly, this argument is forfeited on appeal.  (*People v. Jones* (2003) 29 Cal.4th 1229, 1262.)  Moreover, contrary to Sosa's assertion, the purported misconduct was not so egregious that a timely objection would have been futile or ineffective to cure any purported harm.  (*People v. Dykes* (2009) 46 Cal.4th 731, 757.)  We nonetheless consider and reject Sosa's claim on the merits because, as an alternative to his claim of prosecutorial misconduct, Sosa urges us to hold his counsel's failure to object to the prosecutor's statements constituted ineffective assistance of counsel.

16

vouching.' [Citations.] Misconduct arises only if, in arguing the veracity of a witness, the prosecutor implies she has evidence about which the jury is unaware." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561; see *People v. Linton* (2013) 56 Cal.4th 1146, 1207 ["Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness."'"].)

In the instant case the prosecutor did not invoke the reputation of the District Attorney's office, or her own prestige, to bolster the credibility of the witnesses or suggest she knew they were truthful based on evidence outside of the record. The prosecutor was merely arguing the evidence supported the inference the witnesses were telling the truth. Indeed, even Sosa testified he knew H.A. was an honest child and did not know why either girl would lie. The prosecutor's argument fell well within the permissible range of "comment[s] upon the credibility of witnesses based on facts contained in the record, and any reasonable inference that may be drawn from them . . . ." (*People v. Martinez* (2010) 47 Cal.4th 911, 958.)

4. *The Sentence Does Not Violate California's Prohibition Against Cruel or Unusual Punishment*

To prevail on his claim his sentence constitutes cruel or unusual punishment in violation of the California Constitution, Sosa must overcome a "considerable burden" (*People v. Wingo* (1975) 14 Cal.3d 169, 174) by demonstrating the punishment is so disproportionate to the crime for which it was imposed it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424; see *People v. Dillon* (1983) 34 Cal.3d 441, 478.) The *Lynch* Court identified three factors for the reviewing court to consider in assessing this constitutional claim: (1) the nature of the offense and the offender; (2) how the punishment compares with punishments for more serious crimes in the jurisdiction; and (3) how the punishment compares with the punishment for the same offense in other jurisdictions. (*Id.* at pp. 425-

427.) "Successful challenges" to a sentence as cruel or unusual punishment under California law "are extremely rare." (*People v. Perez* (2013) 214 Cal.App.4th 49, 60 [finding constitutional 30-year-to-life sentence for 16-year old convicted of one count of sexual penetration with a foreign object of nine-year-old and one count of committing forcible lewd act on eight-year-old during single event].)

Sosa contends the 30-year-to-life portion of his sentence is cruel or unusual punishment because the sexual abuse of H.A. and S.A. was "at the mild end of cases."[6] Sosa argues there was no intercourse or oral copulation, but "gentle touching of the breasts and vaginal area" and only S.A. reported vaginal penetration; even then, there was no evidence of the infliction of any injury or pain. He further argues prior to these incidents he showed no proclivity toward sexual abuse of any nature, was a hard working man who always supported his family, the family spent happy times together and a psychiatric report found him to be a suitable candidate for probation with a low range of risk of sexual and violent recidivism.

Whether "gentle" or not, Sosa sexually abused S.A. and H.A. on repeated occasions over the course of three years each. He began abusing each child when she was 10 years old. Moreover, contrary to Sosa's contention, there was evidence of pain: S.A. testified half the time Sosa abused her included vaginal penetration, which hurt. The damage to this family was undeniable. A happy family in which Sosa was loved as a father prior to the incidents was destroyed; S.A. became so depressed she began taking antidepressants in high school, and H.A. had to be enrolled in an independent study program because she was having such a difficult time in high school. As S.A. had feared, H.A. became angry with her when she found out S.A. had been abused but failed to say anything; and the two girls became estranged for some time. The extended duration of Sosa's unlawful conduct and the profound legacy of pain and destruction his actions caused amply justify his sentence.

---

6    Sosa does not challenge the calculation of his sentence or the imposition of consecutive terms on any ground other than the constitutional prohibition of cruel or unusual punishment.

5. *The Domestic Violence Fund Fine Must Be Stricken and the Matter Remanded for Determination of Applicable Assessments*

During sentencing the court ordered Sosa to pay a domestic violence fund fine of $200 pursuant to Penal Code section 1203.097, a restitution fine of $250, a parole revocation fine of $250 (stayed), a "sex offender fine of $300 pursuant to [Penal Code section] 290.3, plus penalty assessments" and "a criminal conviction facilities assessment fee as to each count." The minute order from the May 11, 2011 sentencing hearing reflected an undefined fine of $250, a restitution fine of $250, a parole restitution [revocation] fine in the same amount (stayed), a state penalty fund assessment of $600, a $400 domestic violence fund fine, and separate $30 criminal conviction assessments and $40 court operations assessments for each of the three convictions on which Sosa was convicted. A $300 sex offender fine was added nunc pro tunc by minute order dated May 16, 2011. The abstract of judgment recorded that Sosa was to pay a $400 domestic violence fund fine and does not accurately reflect the other fines, fees and penalties assessed by the court.

Sosa argues, the People concede, and we agree, the domestic violence fund fine (whether $200 or $400) must be stricken because it is applicable only to defendants placed on probation. (Pen. Code, § 1203.97, subd. (a).) Sosa was properly denied probation and sentenced to prison; the fine is thus improper.

Sosa further argues the other fines, penalties and assessments ordered by the court are not sufficiently identified so their propriety may be evaluated. The People agree a remand is necessary for the court to designate the source of the $250 fine and to specify the amount and statutory basis of each fine and assessment. Accordingly, we remand the matter to the trial court to fulfill its obligation to clearly set forth all fines, penalties and fees in its minute order and to correct the abstract of judgment to accurately reflect that order. (See *People v. High* (2004) 119 Cal.App.4th 1192, 1200.) With the exception of the domestic violence fund fine, which is stricken, Sosa will have the opportunity at that time to argue about the propriety of the various fines and assessments.

## DISPOSTION

The judgment is affirmed except as to the imposition of fine, penalties, fees and assessments, as to which the matter is remanded for further proceedings not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

WOODS, J.

SEGAL, J. *

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.