Filed 12/22/23  P. v. Yang CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>XENG YANG,<br><br>    Defendant and Appellant. | F084940<br><br>(Super. Ct. No. F20905961)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Heather Jones, Judge.

Spolin Law, Spolin & Dukes, Aaron Spolin, Caitlin Dukes, and Jeremy M. Cutcher for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Xeng Yang was convicted by jury of sexual intercourse with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a); count 1); lewd act upon a child

(Pen. Code, § 288, subd. (a); count 2); and two counts of aggravated sexual assault of a child by means of rape (Pen. Code, §§ 269, subd. (a)(1), 261, subd. (a)(4); counts 3 & 4).

The trial court sentenced appellant to consecutive indeterminate prison terms of 25 years to life as to count 1 and 15 years to life as to counts 3 and 4, and a determinate prison term of six years as to count 2. Appellant's total prison sentence was 55 years to life plus six years.

On appeal, appellant contends (1) the trial court erred by admitting expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) because the prosecution made an inadequate showing that such testimony was necessary and (2) the trial court erred by denying appellant's motion for new trial based on his contention that permitting a detective to testify about the contents of a sound recording violated Evidence Code[1] section 1523's prohibition of oral testimony to prove the contents of a writing.

We affirm the judgment.

## FACTS

Appellant met Z.T. in approximately 2008. Z.T. had two children when she and appellant met, one of whom was J.Y., born in 2002. Appellant and Z.T. entered into a dating relationship, moved to California together in 2011, and married in the Hmong culture in 2012. Appellant and Z.T. went on to have three other children together.

J.Y. testified that when she first met appellant their relationship was "[l]ike a father and daughter." She liked him at first, but her opinion of him changed when he started touching her inappropriately. J.Y. testified to four separate incidents of sexual abuse.

First, when J.Y. was younger than 10 years old, she was sitting on the couch with appellant and her brother watching SpongeBob on a laptop, when, at some point, appellant started rubbing J.Y.'s vagina over her clothes and later between her shorts and

---

[1] All further undesignated statutory references are to the Evidence Code.

underwear. She thought appellant told her not to tell her mother, and she did not do so because she was scared.

Second, when J.Y. was around nine years old, she was playing hide-and-seek with appellant and her brother. She and her brother hid, while appellant was the seeker. J.Y. was afraid appellant might try to touch her inappropriately again, so she wore jean shorts with three buttons to make it harder for him to touch her. She hid in the bedroom on the corner of the bed curled up in a ball. Appellant came to find her, and when he did, he took off her shorts and her underwear, got on top of her with his penis out, forced his penis into her vagina, and moved his body back and forth with his hands on her hips. J.Y. testified she felt dead. She just "spaced out," and the only thing she felt was pain. J.Y. did not tell her mother about the incident, partly because she did not want to ruin her family.

J.Y. began wearing jeans and a belt to bed to protect herself from further sexual conduct. The third incident happened one night when she was sleeping on the bottom bunk of a bunk bed she shared with her brother. She was not yet 14 years old. Appellant came to her room, and she woke up to him taking off her pants. He pulled off her underwear and put his penis in her vagina and put his hands on her hips. She thought at the time if she tried to get up or fight back, he would hit her. At some point, he stopped and put her pants and belt back on. J.Y. again did not tell anyone because she thought her mother was happy and did not want to ruin that for her.

On another occasion, appellant again came into J.Y.'s room at night and put his penis inside her vagina. She was not wearing jeans because that had not worked. J.Y. gave up and felt "numb" and "dead" and felt pain. J.Y. was again afraid appellant might hit her if she did not allow him to do what he wanted, as he had hit her in the past when she was "being a bad kid." Afterwards, appellant pulled her pants back up and left the room. When appellant left, J.Y. was mad at herself for not standing up for herself, and she cried and punched the wall. Appellant then came back into the room and apologized

3.

and told her he would never do it again. That was the last time he touched her in a sexual manner.

When J.Y. was in the 7th or 8th grade, she told her mother appellant had raped her because she could not hold it in any longer. Z.T. "broke down" in response to hearing this. Appellant was present when J.Y. made this disclosure and admitted it was true. According to Z.T., appellant was trying to "find excuses" and telling J.Y. to stop and let him explain. Z.T. testified J.Y. had never previously told her that appellant had done anything though she would make comments like, "Mom, I don't like him," and at times looked like she was trying to stay away from him.

The news caused Z.T. to have what she described as a "minor stroke." She went to the hospital but started to feel better when she was waiting in the emergency room and went home. Z.T. and her children then stayed with appellant's brother and his wife for a few weeks. Z.T. explained she eventually forgave appellant and decided to give him a second chance because she had no family or friends in town except for appellant's family and friends. She eventually returned to the apartment she shared with appellant, but J.Y. stayed with Z.T.'s brother-in-law for a few additional weeks before returning as well.

After J.Y.'s disclosure, Z.T. did not see appellant the same way. They fought more and she was "always terrified" of him because of what he did. Their fighting turned physical with him as the aggressor, though she hit him back. On one occasion she called the police to report the domestic violence; when they responded, she did not report what had happened to J.Y.

Eventually, Z.T. told her sister about what appellant had done to J.Y., and it was her sister who made the decision to call the police. Z.T. "didn't have the guts" to call, as she felt sorry for appellant and her younger children who she did not want to grow up without a father.

Z.T. testified that at some point she had placed a mini voice recorder in her shared bathroom with appellant because she had a feeling he was cheating on her and having a

4.

girlfriend come over. This recorder picked up a conversation between she and appellant that took place in 2020 where, according to Z.T., "[appellant] mentioned that the only persons that he rape is [J.Y.]" She put the recording on a flash drive and gave it to Detective Derek Avila.

Avila testified Z.T. gave him a flash drive of "some conversations she had." To his understanding, the conversations were in the Hmong language. He booked the flash drive into evidence and "reached out to Detective Cha [Thao] who is Hmong speaking as well and [Avila] had him listen to the contents of the thumb drive to transcribe it for [Avila]—interpret it for [Avila]." On cross-examination, Avila stated he never listened to the conversation himself.

Detective Cha Thao testified Hmong was his first language and he uses it in both his personal and professional life. He was certified by the City of Fresno as a Hmong interpreter. The recording provided to him by Avila was approximately an hour and 40 minutes long and was a conversation between an adult man and an adult female spoken in both Hmong and English. Thao testified the parties to the conversation sounded upset. Thao used the context of the conversation to translate the Hmong statements to English.

At the beginning of the recording, the female, who Thao believed to be Z.T. "said something along the lines of the reason why she didn't want to be with him any more was because—that he couldn't see himself guilty." Thao testified the male said in response, "Yeah, I know what I did."

Later, the female "mentioned something about ever since they've been married that the male had been lying to her" to which the male responded by saying "something along the lines of, 'The only thing that I have lied to you about was [J.Y.],' and also mentioned that that was one of his regrets in his entire life and that he wished to take back."

5.

The third part of the recording Thao thought was "relevant was when the female half was referring to why the male half was so good and that he doesn't see himself wrong or guilty." Thao explained that in Hmong, a particular word that was used— *txaum*—either means "you're wrong or it could also mean that you're guilty" depending on the context of the conversation. The male stated in response to the female's statement, "I am wrong or guilty for what I did bad to [J.Y.]"

The fourth thing that Thao felt was relevant "was when the male half was asking something along the lines of—well, questioning the female half that he didn't love them and why is he doing this now as to why didn't she do this when he wronged [J.Y.] and why now?" The female responded "along the lines of, 'You are the guilty one,' or 'You are the one that's guilty.' "

The fifth portion that Thao described was when "The male half had said that he loved his kids, the female half had said, sarcastically, 'Oh, you love your kids?' And then the male half responded by saying, 'I raised them.' The female half was saying, 'You didn't raise them, you only raped them.' " Thao stated, "I remember the female half talking about, 'You broke her virginity,' and then the male half said, 'There's still [the names of Z.T. and appellant's three other daughters].' "

Dr. Blake Carmichael testified as an expert on CSAAS and overall psychology of child victims. He testified CSAAS is derived from a paper written in the early 1980's by Dr. Roland Summit, where observations of child victims of sexual abuse were synthesized "to help people kind of have a context for understanding child victims' behavior, reactions and disclosures of sexual abuse." The framework is an educational tool that is still used in treatment to help parents dispel misconceptions, for example, that they should have seen the signs of sexual abuse. CSAAS is not used to say "if they've done these things, then they've been abused…. It's used for people to understand there is a variety of ways kids react when they're being abused." For example, according to Carmichael, it is not true that: child abuse victims will always be angry with or hate their

6.

abuser; if one child in a household is being abused, other children must be as well; children are only abused by strangers; and children will remember all the details about incidents of sexual abuse.

Carmichael further testified there were five components of CSAAS: secrecy; helplessness; entrapment or accommodation; long delayed, unconvincing or conflicted disclosures; and retraction or recanting.

As for the "secrecy" component, perpetrators will try to ensure that child victims will not disclose the abuse and therefore might threaten the child or their family members or tell them they will not be believed. Alternatively, a child victim can sometimes keep abuse a secret based on seeing the abuser get angry about other things rather than the perpetrator expressly telling them not to tell. Fear of what will happen to their family after disclosure or shame can also be a component of why a child does not tell anyone about abuse.

As for "helplessness," child victims often do not fight their abusers. When the perpetrator is a trusted adult, the "power dynamic grows even greater."

As to "entrapment and accommodation," children may disassociate and "pull[] back from the reality of what's happening," such as focusing on a corner of the room or playing a song in their head. It is a misconception that children who have been abused will always appear sad or angry when talking about sexual abuse. Children also will still engage with the perpetrator in regard to other activities such as watching movies or playing video games.

As for "delayed, unconvincing disclosure," most child victims do not tell anyone about the abuse right away. They may be unconvincing in the way they recount their experience because their memory and language are not as well developed as that of adults.

Finally, as to "retraction," it is not uncommon for abused children to retract their stories perhaps because of family pressure or negative consequences of telling.

7.

The components of CSAAS are not present in all children who have been abused, or maybe only some components may be present. CSAAS can assist in understanding that there are a variety of ways children can react; it is not used as a "checklist" to determine if abuse happened.

Appellant's sister-in-law testified on his behalf that there had been no occasion that Z.T. asked to spend the night at their house except in 2018, when the whole family, including appellant, stayed for about three to four weeks because there had been flooding in their home. On another occasion, Z.T. and J.Y. spent one night at her house.

## DISCUSSION

### I. Admission of CSAAS Expert Testimony

#### A. *Relevant Background*

The People moved in limine to admit evidence of CSAAS and the neurophysiology of trauma through Carmichael's testimony. In their written motion, they proffered:

> "The People seek to admit evidence of CSAAS for the limited purpose of explaining the myths of sexually abused children and to show that victims' reactions as demonstrated by the evidence are not inconsistent with having been sexually abused. Dr. Roland Summit states that CSAAS is 'proposed as a simple and logical model for use by clinicians to improve understanding and acceptance of the child's position in the complex and controversial dynamics of sexual victimization.' There are five areas or stages of CSAAS: Secrecy, Helplessness, Entrapment or accommodation, delayed or unconvincing disclosure, and recanting or retraction. The purpose of CSAAS is to explain certain myths regarding the above stages."

Appellant moved in limine to exclude expert testimony on CSAAS. Appellant identified "three separate grounds" for exclusion: (1) the prosecution had not provided any relevant statements from any CSAAS expert; (2) CSAAS testimony "would amount to evidence that J.Y. and Z.T. have a character or propensity to tell the truth about the sexual assault and related sex crimes in this case"; and (3) CSAAS testimony "would amount to improper expert opinion that J.Y. and Z.T. are telling the truth about the sexual

assault and related sex crimes in this case." In the alternative, the defense requested the court order that the expert be "prohibited from opining in any way about the likelihood an alleged sexual assault victim is telling the truth."

When the court addressed appellant's motion to exclude CSAAS evidence, the court began with appellant's alleged discovery violation. The prosecutor explained she had not taken any statements from the CSAAS expert and had provided the expert's CV to defense counsel several months prior.

In response, defense counsel stated, "the prosecutor surely has statements from this expert through her office" and "would not be calling this expert unless she had some general idea about what he's going to say and that would be based on past experience in her office, so I think it's her duty to find out this expert's statements on the subject of CSAAS and to provide me with some summary of those statements so I can prepare for my cross-examination. Otherwise, I'm totally in the dark." In response to the trial court's question of whether he was not familiar with CSAAS expert testimony, defense counsel stated, "Not really, no." The trial court concluded that because defense counsel had prepared an in limine motion regarding CSAAS testimony and had received the expert's CV, he thus "had some prior knowledge that this expert was going to be testifying." The court then addressed the prosecutor, and the following colloquy took place:

> "[THE COURT:] So, [prosecutor], your intention, just so we're clear, is to call this witness to explain what [CSAAS] is just in general, they're not to make any correlations between [J.Y.] or [J.Y.]'s mother and [CSAAS] because they haven't interviewed [J.Y.]'s mother and [J.Y.], so they can't make that diagnosis, correct?"

> "[PROSECUTOR]: Correct.

> "THE COURT: So they're just going to sit up here and discuss what [CSAAS] is and what the characteristics of it are?

"[PROSECUTOR]: Correct. They will be asked no hypotheticals by myself.

"THE COURT: And your intention in bringing that is then you, after the summation of all of the evidence during your closing arguments, intend to—to argue that this is why there was late reporting or this is why the family reconciled and then reported later or whatever you intend to argue, but you're planning to make the connection—draw the lines during your argument portion?

"[PROSECUTOR]: Correct, during closing."

In ruling on the CSAAS in limine motion, the trial court first concluded there was no discovery violation because appellant was provided the expert's CV months prior to trial. The court indicated it agreed with appellant that the expert would not be permitted to testify that J.Y. or her mother had the character or propensity to tell the truth. The prosecutor agreed. The court further ruled the expert would not be permitted to vouch for J.Y. or J.Y.'s mother by saying statements like " 'Making allegations is rare." With those limitations, the court ruled the expert was allowed to testify.

### B.    Analysis

Appellant's challenge to the admission of CSAAS evidence in this case is a narrow one. He contends that the prosecution made an inadequate showing that the testimony was being introduced for a legitimate purpose. Appellant contends (1) the prosecution did not adequately show CSAAS was "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" as provided in section 801, subdivision (a)[2] and (2) the prosecution did not carry its burden to produce evidence "as to the existence of the preliminary fact" that "jurors would harbor

---

[2]    Section 801, subdivision (a) provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is" "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."

misconceptions as to this subject matter" so as to justify admission of the evidence as provided in section 403, subdivision (a).**3** We find no error.

We will not disturb a trial court's decision to admit expert testimony on appeal unless a manifest abuse of discretion is shown. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)

Our high court has held expert testimony on CSAAS, or "the common reactions of child molestation victims" is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior' " but is inadmissible, however, to prove the abuse occurred. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.) In California, CSAAS testimony has been deemed admissible for its limited purpose of assisting the fact-finder in evaluating the credibility of an alleged victim of child sexual abuse for decades. (See, e.g. *People v. Lapenias* (2021) 67 Cal.App.5th 162, 172–175; *People v. Munch* (2020) 52 Cal.App.5th 464, 468–473 (*Munch*); *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394; *People v. Gray* (1986) 187 Cal.App.3d 213, 217–220; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1097–1100.)

---

**3** Section 403, subdivision (a) reads: "The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] (1) The relevance of the proffered evidence depends on the existence of the preliminary fact; [¶] (2) The preliminary fact is the personal knowledge of a witness concerning the subject matter of his testimony; [¶] (3) The preliminary fact is the authenticity of a writing; or [¶] (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself."

Courts have recognized that CSAAS evidence is at risk of being "misapplied as a predictive index by the jury." (*People v. Bowker*, *supra*, 203 Cal.App.3d at p. 393.) Thus, the evidence must be tailored to the purpose for which it is being received; it must be "targeted to a specific 'myth' or 'misconception' suggested by the evidence" though the prosecution does not have to identify the specific misconception to be addressed; it is sufficient if the victim's credibility is placed in issue due to paradoxical behavior, such as delay in reporting a molestation or in inconsistent statements. (*Bowker*, at pp. 393–394; see, e.g., *People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745.)

Before reaching appellant's narrow issue, we note that in applying these general principles, the trial court did not abuse its discretion in allowing CSAAS testimony. As we have stated, an abundance of published case law supported the prosecution's position that CSAAS evidence was admissible to disabuse the jurors of misconceptions about how child sexual abuse victims behave. Here, the evidence demonstrated that the CSAAS testimony was relevant and helpful to the jurors, as the relationship between J.Y. and appellant was one where J.Y. may have felt pressure to keep the abuse a secret based on the power imbalance and familiarity of the relationship, and J.Y. did not fight back against appellant, did not tell anyone about the abuse for years, and continued to live with appellant without letting on to other members of the household what had happened. The jurors would have benefitted from learning these behaviors were not necessarily inconsistent with behaviors of abused children in evaluating J.Y.'s credibility.

Moving to appellant's specific argument, to the extent he is arguing the prosecution was required to offer evidence to justify admission either under section 801 or section 403, respondent contends appellant forfeited this claim by failing to object on these grounds below. We agree with respondent. Had appellant wanted to argue expert testimony was not relevant or necessary because the behaviors of child sexual abuse victims were not beyond the common knowledge of jurors, or similarly because he disputed the preliminary fact that the jurors harbored misconceptions about child sexual

12.

abuse victims, he could have requested an evidentiary hearing at which the prosecution could have presented evidence as to the necessity of the testimony.  (See § 402, subd. (a) [the article setting forth the procedure for establishing preliminary facts applies when the existence of a preliminary fact "is disputed"].)[4]  As appellant did not do so, this issue was not properly litigated before the trial court, and we cannot adequately review his claim.

To the extent appellant is generally asserting on appeal that CSAAS testimony is no longer relevant because jurors no longer harbor the misconceptions CSAAS is meant to disabuse, we reject this argument.  The Court of Appeal in *Munch* fairly recently rejected a similar argument.  (*Munch*, *supra*, 52 Cal.App.5th at p. 468.)  There, the court held that it was bound by our high court's holding in *McAlpin*, *supra*, 53 Cal.3d 1289 that CSAAS evidence is admissible to rehabilitate a child sexual abuse victim's credibility and " ' "is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' "  (*Munch*, at p. 468; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  The *Munch* court reaffirmed that "CSAAS evidence is a valid and necessary component of the prosecution case in matters involving child abuse" and "the reasoning of *McAlpin* is as valid today as it was in 1991."  (*Munch*, at p. 466.)  We can find no court who has disagreed with *Munch*'s conclusion to date.  We agree with the appellate court in *Munch* and conclude the evidence was probative under *McAlpin* based on the state of the evidence, as we have explained.

For these reasons, we conclude the court did not err by allowing CSAAS testimony in the present case.

---

**4**     If appellant had lodged the appropriate objection, the prosecution likely would have been able to present such evidence, as Carmichael testified at trial CSAAS is still used in treatment today to help dispel myths held by parents of abused children.

## II. Denial of Appellant's New Trial Motion Regarding Admission of Thao's Testimony

### A. *Relevant Legal Background*

"The content of a writing may be proved by an otherwise admissible original." (§ 1520.) The content of a writing may also be proved by otherwise admissible "secondary evidence" unless "[a] genuine dispute exists concerning material terms of the writing and justice requires the exclusion" or "[a]dmission of the secondary evidence would be unfair." (§ 1521, subd. (a).) A "writing" includes "every other means of recording …, any form of communication …, including … sounds." (§ 250.)

Section 1523 provides that oral testimony is not admissible to prove the content of a writing unless one of the statutory exceptions apply. (§ 1523.) These exceptions are (1) "if the proponent does not have possession or control of a copy of the writing and the original is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence" (§ 1523, subd. (b)); (2) "if the proponent does not have possession or control of the original or a copy of the writing and either" (a) "[n]either the writing nor a copy of the writing was reasonably procurable by the proponent by use of the court's process or by other available means" or (b) "[t]he writing is not closely related to the controlling issues and it would be inexpedient to require its production" (§ 1523, subd. (c)); or (3) "if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole" (§ 1523, subd. (d)). Oral testimony to prove the contents of a writing is not governed by section 1521. (See § 1521, subd. (b) ["Nothing in this section makes admissible oral testimony to prove the content of a writing if the testimony is inadmissible under Section 1523 (oral testimony of the content of a writing)."].)

## B.     *Relevant Procedural Background*

Appellant moved in limine to exclude Thao's testimony to prove the contents of the sound recording produced by Z.T. of her conversation with appellant pursuant to section 1523.

The trial court initially did not agree with appellant that the sound recording was a "writing" and ruled that if the People laid the proper foundation, Thao would be permitted to testify as to the contents of the sound recording.

Later, after the evidence portion of trial had begun and prior to Thao's testimony, defense counsel again noted his position that Thao's testimony was prohibited by section 1523 and asserted his intention to preserve his objection for the record. This prompted the trial court to state its intention to make its ruling on the record clear prior to Thao's testimony. The court stated that based on section 1523, the sound recording "may qualify as a writing," and assuming that it did, it was admissible "by otherwise admissible secondary evidence, which in this case is Detective Thao's testimony, as long as it's not subject to the exclusionary rule and the Court has ruled that it is statements of the defendant and, therefore, there is a hearsay exception that applies." The court noted under section 1523, subdivision (d), it was "finding that Detective Thao's testimony as secondary evidence is appropriate" because the recording was approximately two hours long, contained statements in both English and Hmong languages, and, according to the parties, contained "lots of statements that are inflammatory to the defendant and have nothing to do with this case and that neither of you wish to have presented to the jury." The court explained the length of the recording as well as the mixture of English and Hmong "would only cause confusion to the jury and would be unhelpful." The court further ruled that appellant's objections that Thao's interpretation may not be accurate "goes to the weight, not the admissibility" of the evidence and defense counsel would be "free to develop all of that on cross-examination" and bring in portions of the recording

the defense felt was inaccurately interpreted and play them himself or have the Hmong interpreter on his witness list testify in rebuttal to Thao's testimony.

Thao testified at trial, and appellant was convicted, as described, *ante*.

Following appellant's conviction, and prior to the trial court's pronouncement of judgment, appellant moved for a new trial under Penal Code section 1181, paragraph 5, which provides that a court may grant a new trial "[w]hen the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury." Appellant reiterated his argument that Thao's testimony was inadmissible pursuant to section 1523 and violated his state and federal constitutional rights "to due process and trial."

In ruling on appellant's new trial motion, the trial court reiterated its ruling that the contents of a writing may be proved by "otherwise admissible secondary evidence," and that proper foundation was laid for the recording. The court explained it found Thao's testimony satisfied section 1523, subdivision (d), and that "the length of the recording coupled with the fact that it was a mixture of Hmong and English" rendered admission of Thao's testimony "appropriate." The court added that the recording included inflammatory, irrelevant information that neither party wanted to present to the jury. The court explained that Thao's testimony also provided context for the conversation and "gave the general description of what was happening, gave the setting and the nature of the conversation, the emotional aspect of it" and in "[s]everal points of his testimony he described that a certain Hmong word was used and that it could mean different things in the Hmong language, but in the context of the conversation, given all the other statements he heard, he gave what his understanding of that word in the context it was utilized." The court reiterated defense counsel was free to cross-examine Thao on the accuracy of his interpretation.

16.

The trial court went on to explain that it found "[t]he testimony from the victim and the victim's mother … extremely compelling" and that J.Y.'s testimony was "absolutely credible, and, frankly, heartbreaking," and "[t]he details that she testified to were specific and very sad." The court stated it found the defense's theory that the allegations were fabricated so Z.T. could get out of her relationship with appellant was undermined by the evidence that neither J.Y. nor Z.T. made any attempts to contact the police and neither wanted any attention from the allegations. The court stated that J.Y.'s and Z.T.'s testimony was "the most compelling and credible evidence that the Court heard." The court stated it did not find error by admission of Thao's testimony, but "[i]f there was, it would be harmless."

### C.     Analysis

" 'The trial court has broad discretion in ruling on a new trial motion, and its decision will be disturbed only for clear abuse of that discretion.' " (*People v. Carabajal* (2022) 86 Cal.App.5th 1, 7.)

Appellant contends the court erred by denying his motion for a new trial, again asserting that Thao's testimony was inadmissible under section 1523. Respondent does not assert the court's evidentiary ruling was correct but argues appellant failed to show the admission of the testimony resulted in a miscarriage of justice. We agree with respondent and conclude the trial court did not abuse its discretion in denying appellant's motion for new trial. As we explain, we agree the trial court's initial ruling allowing Thao to testify to the contents of the recording was erroneous; however, we find the trial court did not err in denying appellant's new trial motion because its finding that any error was harmless was reasonable and supported by the record.

First, as we have stated, we agree with appellant that Thao's testimony was inadmissible to prove the contents of the recording, as none of the exceptions set forth in section 1523 could reasonably apply. It does not appear to be disputed that because the prosecution was in possession of the recording, the exceptions set forth in section 1523,

17.

subdivisions (b) and (c) did not apply.  Rather, the trial court relied on the exception set forth in section 1523, subdivision (d), which applies when two conditions are fulfilled: (1) when the writing "consists of numerous accounts or other writings that cannot be examined in court without great loss of time," and (2) "the evidence sought from [the writings] is only the general result of the whole."  The trial court's conclusions that both applied was not reasonable.

It cannot reasonably be concluded that the examination of the writing, i.e., playing the recording for the jury, would result in a "great loss of time," as the prosecution sought to introduce only five, very short snippets of the recording, and the parties agreed the recording in its entirety contained irrelevant information.[5]  The record discloses no reason why the prosecution could not have made clips of the recording and played them for the jury with any portions in Hmong provided via a written transcript.  It also cannot reasonably be concluded that the evidence sought was "only the general result of the whole" because the relevant evidence was not a "general result" or summary but specific statements made by appellant, which required evaluation by the jury.  We acknowledge Thao testified he relied on the context of the conversation to make his translations, but the prosecution could have played other portions of the conversation to establish, for example, the emotional tone of the conversation or sought additional testimony from Z.T. to set more context for the conversation, and/or presented testimony from the interpreter to explain any nuances relevant to Hmong-to-English translation.  For these reasons, we conclude the trial court erred by allowing Thao to testify to the contents of the sound recording.

---

[5]     Even if the prosecution sought to admit the entire recording, one hour and 40 minutes does not strike us as a "great loss of time."  Law enforcement interviews with defendants, as one example, are frequently played at trials and can be up to two hours or more.

This does not end our analysis, as we also conclude the trial court's determination that any error was harmless was reasonable and supported by the record. As such, the denial of the new trial motion was not an abuse of discretion. It is appellant's burden to prove that a more favorable result is reasonably probable had the recording itself been played for the jury with a translated transcript in lieu of Thao's testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837.)[6] He did not carry this burden before the trial court and has not done so on appeal.

There is little to no evidence on the record that admitting the recording instead of Thao's testimony would have affected any juror's verdict. Even assuming the actual recording would not be admitted at a new trial, we still find the trial court's conclusion that any error was harmless was reasonable. Thao's testimony was short and relative to the other testimony, not a large portion of the People's case. The admissions testified to by Thao were somewhat vague and when considered in context of the entire trial record, not particularly compelling. We take note of the trial court's comments that J.Y.'s testimony was "absolutely" credible and that her and Z.T.'s testimony was the most compelling part of the People's case. This is significant, as the trial court, in evaluating appellant's new trial motion, could rely on the witnesses' live testimony—something we as the reviewing court cannot do—and we defer to the trial court's finding that the witnesses had strong credibility. In addition, Z.T., a party to the conversation and therefore competent to testify to its contents, testified that during the conversation, which

---

[6] Appellant makes the bare assertion that his constitutional right to a fair trial was violated by the admission of the testimony and, in asserting the error was prejudicial, that "he was prejudiced pursuant to both *Chapman v. California* [(1967) 386 U.S. 18] and … *Watson*." However, "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Appellant does not cite any authority to support or make any specific arguments that the asserted error rises to the level of an error of constitutional magnitude necessitating us to apply the more stringent *Chapman* standard. As such, we apply the *Watson* standard.

was the subject of the recording, appellant admitted to "rap[ing]" J.Y. Moreover, both Z.T. and J.Y. testified that appellant had admitted J.Y.'s allegations were true the day J.Y. disclosed them to Z.T. As the trial court pointed out, that neither J.Y. nor Z.T. reported the allegations to law enforcement and Z.T.'s testimony that she wanted to stay with appellant so her children would have a father is persuasive evidence that they did not, as appellant argued to the jury, conspire to get Z.T. out of her toxic or abusive relationship with appellant.

In our view, the primary risk of prejudice arising from admission of Thao's testimony to prove the contents of the recording was that it deprived the jury of evaluating the tone or any other similar vocal characteristics of appellant's responses to Z.T.'s statements, which would have helped the jury evaluate what weight to give the statements. Appellant has not offered any argument, however, as to whether this lost opportunity would have affected a juror's verdict.

Instead, appellant's primary arguments in support of his contention he was prejudiced is that the prosecution relied on Thao's testimony in their closing argument and the jury requested readback of it. These arguments are unavailing. First, appellant's arguments ignore that the question before us is not whether the admission of appellant's statements affected the jury's verdict, but whether the admission of Thao's testimony *in lieu* of the recording itself affected the jury's verdict.[7] In any event, as we have stated,

---

[7] Appellant has not contended the recording itself would have been inadmissible for any reason. Below, he moved to exclude the sound recording based on "multiple discovery violations and substantial prejudice to [appellant]." (Emphasis omitted.) In ruling on this motion, the trial court concluded there was no discovery violation, as appellant was provided the recording and the police report containing the portions of the recording Thao found relevant and the translations of those portions. Appellant does not contend on appeal this ruling was erroneous. In addition, any potential undue prejudice from irrelevant portions of the recording could have been mitigated by playing only the relevant portions; the fact that the trial court only allowed Thao to testify to the relevant portions is a good indicator that prejudicial irrelevant portions would not have been played for the jury.

the admissions, whether they were presented through Thao's testimony or through playing the recording for the jury, were not a large part of the People's case when viewed in context of the totality of the evidence, contrary to appellant's contention.

Second, we acknowledge, as appellant points out, that the jury requested readback of Thao's testimony. Appellant interprets this as the jury placing particular importance on it; however, based on the context of this request, we decline to make the same interpretation. We note that while the jury was awaiting the readback of Thao's testimony, they informed the court one of the jurors was having trouble deliberating due to a cultural bias. The court did not address this concern until after Thao's testimony was read, at which point, the court concluded the juror was refusing to deliberate, excused that juror, and replaced them with an alternate juror. The jury was then instructed that they "must set aside and disregard all past deliberations and begin [their] deliberations all over again" and "decide this case as if those earlier deliberations had not taken place." Because the readback was requested and delivered before the jury began deliberations anew, we cannot rely on the jury's request for readback as evidence the jury found it important. Even if the request had not occurred before the jury restarted their deliberations, we note several circumstances of Thao's live testimony that may have made it difficult for the jury to follow, necessitating a readback. Thao's testimony was given via Zoom for COVID-19 related reasons, and there were several times throughout Thao's testimony that it was noted in the record that he "froze" or had audio issues. We also note Thao's testimony was replete with overruled defense objections. We do not in any way fault defense counsel for wanting to make his record but only point out that this, along with the Zoom issues, could have been distracting to a jury trying to parse out the substance of Thao's testimony. Based on these circumstances, it is not surprising in the least the jury would want a readback of the testimony to simply understand it rather than because it held significant importance to its view of the People's case.

21.

For these reasons, we conclude the court did not err by denying appellant's new trial motion.

## **<u>DISPOSITION</u>**

The judgment is affirmed.


                                                              DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


POOCHIGIAN, J.

22.