Filed 4/15/24

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MANUEL DEJESUS FLORES,<br><br>    Defendant and Appellant. | D083310<br><br><br><br>(Super. Ct. No. INF1801453) |

APPEAL from a judgment of the Superior Court of Riverside, Matthew C. Perantoni, Judge.  Affirmed in part; reversed in part, and remanded with directions.

Mark A. Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Andrew S. Mestman and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

Thirty years ago, our Supreme Court updated the so-called "fresh complaint" doctrine governing evidence of an extrajudicial disclosure made by the victim of a sexual offense.  (*People v. Brown* (1994) 8 Cal.4th 746

(*Brown*).) Rejecting "outdated notions" that a sexual assault victim is normally expected to disclose the incident promptly (*id.* at p. 749), the court ruled that the "freshness" of the disclosure and its "volunteered" nature should no longer "be viewed as essential prerequisites to the admissibility of such evidence." (*Id.* at p. 750.) The court further concluded that evidence of the victim's disclosure "may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Id.* at pp. 749–750.)

In the thirty years since *Brown* was decided, California courts have not elaborated on its holding regarding the admissibility of a delayed disclosure. However, courts in other jurisdictions with similar rules have more explicitly ruled that a child victim's delay in disclosing sexual abuse does not affect the admissibility of the disclosure and should instead be considered by the trier of fact as one factor in evaluating its weight. These courts have also discarded the outdated and misleading "fresh complaint" label in favor of more accurate titles.

We now join these other jurisdictions. As the Supreme Court recognized in *Brown*, the mere fact that the victim's disclosure is not "fresh" does not render it inadmissible. Especially for a child victim, any delay in making a disclosure is generally for the trier of fact to consider in evaluating its weight and significance. Absent other circumstances creating some undue prejudice, delay alone does not render inadmissible an otherwise relevant disclosure. Accordingly, we encourage California courts and commentators to

2

abandon the "fresh complaint" misnomer and refer to this evidentiary rule more accurately as the "prior disclosure" doctrine.

Applying these principles, we find no error in the trial court's admission of victim disclosure evidence against Manuel Dejesus Flores at a jury trial in which he was convicted of four counts of lewd and lascivious acts committed against two victims under 14 years old (Pen. Code,[1] § 288, subd. (a)). We also reject Flores's contention that the trial court erred by admitting expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS). We accept the People's concession that the matter must be remanded for the trial court to calculate and award presentence conduct credits, but we affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Sexual Abuse Allegations Against Flores*

Between 2006 and 2008, sisters B.C. and Y.G. lived with their parents in an apartment in Palm Desert, California. B.C. was between five and seven years old at the time, and Y.G. was between four and six. Flores, a friend of the family, lived in their apartment with them and was often alone with the girls while their parents were out.

B.C., who was 21 years old at the time of trial, testified that when Flores lived with them, he once bent her over the edge of the bed in his room and attempted to penetrate her vagina with his penis. B.C. remembered that she was wearing a pajama gown, that he pulled down her underwear, and that she could see outside through the window from the bed, but she could not recall many other details about the incident.

---

[1]     Unless otherwise noted, further undesignated statutory references are to the Penal Code.

3

Another time, B.C. awoke to Flores attempting to penetrate her anus from behind her while she was sleeping. She remembered wearing gray pajamas, lying on her side, and feeling pain, but could not recall what happened afterwards. B.C. remembered that Flores had touched her inappropriately other times, but she could not recall details from those instances. She also did not recall Flores asking her to touch his penis, or any instances of oral copulation, although she had previously told law enforcement that such incidents occurred. B.C. said she once saw Flores lying on his back in his bed with Y.G. sitting on top of him in a riding position, while both were unclothed.

B.C. did not tell her mother about these incidents because she felt embarrassed and did not fully understand what had happened. B.C. also said she did not want to talk about the abuse because Flores was a family friend, and because she was friends with Flores's daughter. Flores eventually moved out of the apartment near the end of 2007 and the abuse stopped after that.

Y.G. testified that Flores also touched her inappropriately more than once and that it became "like a routine," but she only had a vivid memory of one incident. She recalled watching television with B.C. in Flores's room at her uncle's house in Indio, California, when Flores tried to penetrate her vagina with his penis. She said that on multiple occasions, he also took Y.G.'s hand and used it to rub baby oil on his penis. She recalled being around four years old and seeing her father in the backyard through the window blinds during one time when Flores was abusing her, and that Flores told her not to say anything. She also remembered that Flores would make B.C. "go first" and that he would try to penetrate B.C. while she was laying on her stomach, and that Y.G. would focus on watching television so she

4

would not have to pay attention to what was happening to her sister. Y.G. could not recall whether Flores abused her in her parents' apartment in Palm Desert, and she said she could not remember "a lot of [her] childhood." She also did not recall ever sitting on top of Flores in a riding position, as B.C. described in her testimony.

Y.G. did not tell her parents about the abuse. She also did not talk to B.C. about it because it was difficult to talk about, and Y.G. did her best to "block it out of [her] memory." She did not want anyone to find out about the abuse.

*B. Other Sexual Abuse Allegations Against a Cousin*

In 2013, Riverside County employees interviewed B.C. and Y.G. after their mother found sexual messages between their teenage older sister and an adult male cousin named Nelson. B.C., who was 12 years old at the time of the interview, said that Nelson had touched and grabbed her inappropriately over her clothes multiple times within the last year, and also a few years prior. Y.G., who was 10 years old at the time of the interview, also said that Nelson touched and grabbed her inappropriately over her clothes a couple years prior. Neither B.C. nor Y.G. reported inappropriate touching by Flores during those interviews.

*C. B.C.'s Disclosure*

In March 2016, when B.C. was a high school freshman, she told a few friends at school that she had been touched inappropriately by someone living in her house when she was younger. She disclosed what happened after her friends noticed she was "a little bit off that day" at school and asked her what was wrong. B.C. began crying, "panicking," and "shaking" before she told them about the abuse, and she asked her friends to keep it a secret. But one of her friends told B.C.'s boyfriend, and eventually someone reported

5

the disclosure to Child Protective Services (CPS). A CPS worker notified the girls' parents about the abuse in April 2016, and their mother called the police.

*D. The People's Expert Testimony*

Dr. Jody Ward, a clinical and forensic psychologist specializing in sexual offenses and abuse, provided expert testimony about CSAAS. She defined CSAAS as "a pattern of behaviors that many children exhibit who have been sexually abused within an ongoing relationship." Dr. Ward did not review police reports or interview any witnesses in connection with the case, but rather, testified generally about how children respond to sexual abuse. She explained that while CSAAS is helpful in understanding a child's reactions to abuse, it is not a diagnostic tool and cannot be used to determine whether or not sexual abuse occurred in a particular case.

Dr. Ward stated that there are five components of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed "unconvincing" disclosure, and retraction or recantation. Secrecy refers to the fact that children "keep the secret of sexual abuse for a very long period of time" and "don't need to be threatened in the way we would consider a threat in order to keep that abuse secret." Many children "don't have to be reminded or threatened at all to keep the abuse secret, just by virtue of the fact that it occurs in secret, and because of the nature of sexual abuse, children naturally keep the secret of sexual abuse for long periods of time."

Helplessness refers to "the power imbalance between adults and children" and how children are taught to "obey other adults as authority figures." This includes requiring children to give affection to adults "they may or may not feel comfortable giving that affection to," and the fact that children "are completely dependent and reliant on the adults around them for

6

everything[.]" Helplessness also refers to the fact that a child "isn't strong enough to fight off the abuser . . . so a child has to use other ways to cope with the ongoing abuse."

As for entrapment and accommodation, Dr. Ward said that because a child usually "doesn't report the sexual abuse right away, the abuser could go back to that child for more and more sexual abuse over a period of time[,]" which leads to the child becoming entrapped in the situation. Once entrapped, the child has to learn to accommodate the abuse in other ways, such as by acquiescing to or putting up with it "in order to keep their family together or in order to keep the positive aspects that may also be going on in that sexually-abusive relationship." For example, a child may have a good relationship with their abuser outside of the abuse, and the abuser may be someone the child "looks up to[,] loves and is loyal to." In that sense, CSAAS provides a way of explaining why a child would still want to be around their abuser to maintain the status quo, or even receive some of the positive benefits of the relationship.

Dr. Ward testified that because helplessness, entrapment, and accommodation interfere with a child's ability to report abuse or take action to stop it, two thirds of children delay disclosure of their sexual abuse until adulthood. And because ongoing sexual abuse usually develops slowly over a period of time, a child may be "completely involved in the sexual relationship before they even realize" what is happening. Many children "just choose to put up with" the abuse over many years because disclosure risks upsetting family dynamics. When a child does make a disclosure of sexual abuse, they may not disclose every detail or incident at once, which "can make it unconvincing." If the person hearing the disclosure is not receptive, then the child is much less likely to talk about sexual abuse in the future. Dr. Ward

7

observed that "what we normally see is children who are young perhaps . . . mak[ing] a disclosure to someone at school, and the school officials will make that disclosure to police." Adolescents also "usually make disclosures to their peers and that peer makes a disclosure to an adult," who then notifies authorities.

Dr. Ward stated that the recantation and retraction components of CSAAS occur less often, but can happen when the consequences of disclosure "rain[] down on the person," causing the victim to "backpedal," "minimize," or "completely recant" altogether.

Dr. Ward also testified about how traumatic stress impacts memory. Victims often lump recurring sexual abuse memories together such that victims "don't tend to remember every single little detail of every single event that happened[.]" Children often do not have a fully developed sense of time until they are approximately 11 years old, and they may cope with sexual abuse by suppressing memories and trying to forget them.

*E. Defense Evidence*

Several relatives of Flores and the victims' parents observed that B.C. and Y.G. behaved normally around Flores and greeted him like any other member of the family. Flores was a sponsor at B.C.'s quinceañera in 2015, and the victims and their parents attended another family member's quinceañera in June 2016 where Flores was also present.

When a CPS worker interviewed the victims after B.C.'s 2016 disclosure, there was some initial confusion about whether the victims were reporting abuse by their cousin Nelson or by Flores.

A clinical and forensic psychologist testified that Flores posed a low risk of recidivism, assuming he had committed the charged offenses.

Lastly, Flores testified in his own defense and denied the allegations.

8

*F. Pretrial Proceedings*

In 2019, the People charged Flores with six counts of lewd and lascivious acts on or between 2006 and 2008 on a victim under 14 years old (§ 288, subd. (a), counts 1-3 as to B.C., and counts 5-7 as to Y.G.), and one count of oral copulation or sexual penetration with B.C. on or between 2006 and 2008 (§ 288.7, subd. (b), count 4).[2]  The People further alleged that Flores committed a qualifying sex offense against more than one victim under section 667.61, subdivision (e)(4), making him ineligible for probation if convicted.  (See § 667, subd. (c)(2).)

At a pre-trial hearing, the People sought to introduce evidence regarding B.C.'s 2016 statements to her friends under the fresh complaint doctrine.  The defense objected on the ground that B.C.'s disclosure was "not fresh" because it occurred several years after the abuse allegedly ended in 2008.  The court observed that while the complaint was not fresh, case law interpreting the doctrine "over the years" had indicated that a complaint's freshness had diminished importance when it came to admissibility.  The court ruled that the evidence was admissible for the limited nonhearsay purpose of establishing the circumstances under which B.C. reported the offense to others.

*G. Jury Instructions and Verdict*

After 13 days of trial, the trial court gave instructions to the jury.  The court instructed, among other things, that it could consider B.C.'s statements to her friends both to evaluate her testimony and as "evidence that the

---

[2]  The People alleged that the charges were brought under section 801.1, subdivision (a), which provides in relevant part that prosecution of certain felony offenses, including under section 288, that are "alleged to have been committed when the victim was under 18 years of age, may be commenced any time prior to the victim's 40th birthday."  (§ 801.1, subd. (a).)

information in those earlier statements" was true.  (See CALCRIM No. 318.)
The court also instructed that Dr. Ward's testimony about CSAAS was "not
evidence that the defendant committed any of the crimes charged against
him" and that jurors could "consider this evidence only in deciding whether or
not [B.C.'s and Y.G.'s] conduct was not inconsistent with the conduct of
someone who has been molested, and in evaluating the believability of their
testimony."  (CALCRIM No. 1193.)

After deliberating for about a day, the jury found Flores guilty of four
total counts of lewd and lascivious acts on a victim under 14 years old—two
counts as to B.C. and two counts as to Y.G. (§ 288, subd. (a), counts 1, 3, 5, 7).
The jury also found true the allegation that Flores committed a qualifying sex
act against more than one victim.  (§ 667.61, subd. (e)(4).)  The jury hung on
count 2 alleging a lewd and lascivious act on B.C. (§ 288, subd. (a)), found
Flores not guilty of count 4 alleging oral copulation on B.C. (§ 288.7, subd.
(b)), and found him not guilty of count 6 alleging a lewd and lascivious act on
Y.G. (§ 288, subd. (a)).

The trial court sentenced Flores to a total of 50 years to life in prison
and denied him any conduct credits.  Flores timely appealed.

DISCUSSION

I

Flores argues on appeal that the trial court erred in admitting B.C.'s
statements to her high school friends under the fresh complaint doctrine
because her disclosure was not "fresh" enough.  (*Brown, supra*, 8 Cal.4th
746.)  We disagree.

"We review claims regarding a trial court's ruling on the admissibility
of evidence for abuse of discretion.  [Citations.]  Specifically, we will not
disturb a trial court's ruling 'except on a showing the trial court exercised its

10

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*); Evid. Code, § 353.)

In *Brown*, our Supreme Court traced the centuries-old origins of the fresh complaint doctrine back to the "13th-century rule of 'hue and cry,' which required victims of rape and other violent crimes to alert the community immediately following the commission of the crime. Under this ancient rule, a victim's extrajudicial 'complaint' was a necessary element of, and therefore admissible as part of, the prosecution's case-in-chief." (*Brown, supra*, 8 Cal.4th at p. 754.) After courts developed the hearsay rule in the 1800s, the fresh complaint doctrine replaced "hue and cry," allowing the limited admission of evidence of the *fact* that the victim had complained of sexual assault, but excluding other details. (*Id.* at p. 755.) During that time, courts still prescribed to the faulty assumption that if a woman failed to report her assault, then the "only rational explanation" was that the offense did not occur. (*Ibid.*)

In cases throughout the 1900s involving sexual offenses against minors, courts consistently upheld the admission of a victim's out-of-court statements disclosing abuse under the fresh complaint doctrine for the limited purpose of showing that a complaint was made, not for the truth of the matter asserted. (See *Brown, supra*, 8 Cal.4th at p. 756 [listing cases].) Historically, the victim's complaint still had to have been "truly 'fresh' or 'recent' " after the alleged abuse occurred to be admissible. (*Id.* at p. 757.) The underlying rationale for the "freshness" requirement was that if the victim remained silent for too long, then a jury was entitled to draw negative inferences based on that silence. (*Ibid.*)

11

The Supreme Court recognized in *Brown*, however, that the historic premises of the fresh complaint doctrine were unsound. "The overwhelming body of current empirical studies, data, and other information establishes that it is *not* inherently 'natural' for the victim to confide in someone or to disclose, immediately following commission of the offense, that he or she was sexually assaulted." (*Brown, supra*, 8 Cal.4th at p. 758.) Child victims in particular "commonly are reluctant to report such incidents and delay in doing so, or fail to provide a full report. Frequently, the child victim is unaware of the wrongful nature of the conduct or that what has occurred is not 'normal.' The victim also often experiences feelings of confusion and guilt, the desire to forget the incident, and the fear of not being believed, and in many instances may remain silent as a result of intimidation by the abuser." (*Ibid.*) These observations are consistent with what we now understand about CSAAS. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*); *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*) [CSAAS evidence addresses typical reactions children may have to abuse, including initially denying the abuse or delay in reporting the abuse].)

After discussing how some out-of-state courts had reframed the fresh complaint doctrine, the court in *Brown* revised the doctrine to move beyond its faulty underlying premises while still preserving its legitimate aim of rebutting the false presumption that true victims make prompt complaints. (*Brown, supra*, 8 Cal.4th at pp. 758–759.) The court concluded that "evidence of the fact of, and the circumstances surrounding, an alleged victim's disclosure of the offense may be admitted in a criminal trial for nonhearsay purposes under generally applicable evidentiary principles, provided the evidence meets the ordinary standard of relevance." (*Id.* at p. 763, citing Evid. Code, § 210.) The court explained that "the admissibility of such

12

evidence does not turn *invariably* upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry or questioning from another person. *Rather*, these factors simply are to be considered among the circumstances of the victim's report or disclosure that are *relevant in assisting the trier of fact* in assessing the significance of the victim's statements in conjunction with all of the other evidence presented." (*Brown,* at p. 763, italics added.) In other words, under *Brown*, "freshness" is no longer one of the "essential" prerequisites to admission under the fresh complaint doctrine. (*Id.* at p. 750.)

Applying the modified doctrine to the facts in that case, the *Brown* court concluded that evidence of the victim's complaint was admissible, even though the victim had remained silent about the abuse over a period of several years. (*Brown, supra*, 8 Cal.4th at pp. 763–764.) The court found that the circumstances of the complaint "tended to shed light upon the reasons she ultimately did come to disclose the molestation, as well as the reasons for her substantial delay in doing so, and tended to forestall any erroneous inferences that might have arisen in the absence of that evidence." (*Id.* at p. 764.) The court also found that the victim's complaint fell within the limits governing admissibility because, among other factors, the victim testified that she felt "scared" and was "reluctant to tell her mother about the alleged molestation." (*Ibid.*) The court concluded that the evidence was therefore appropriately limited to the circumstances surrounding the disclosure, including the timing of the complaint, and not the description of the molestation itself. (*Ibid.*)

13

In accordance with *Brown*, we conclude that the trial court here did not abuse its discretion by admitting B.C.'s disclosure statements for the limited nonhearsay purpose of establishing the circumstances surrounding her disclosure. B.C. was only prompted to disclose the abuse after friends at school asked her what was wrong because she was acting "a little bit off." B.C. was visibly shaken and upset while telling her friends what happened, and afterwards, she asked them to keep the disclosure a secret. Although B.C. delayed disclosure for several years, she also testified that she did not tell her mother sooner because she felt embarrassed, she did not fully understand what had happened, and Flores was a family friend. (*Brown, supra,* 8 Cal.4th at p. 764.) When considered together with the CSAAS testimony, this evidence helped "shed light upon the reasons" for her delayed disclosure and "tended to forestall any erroneous inferences that might have arisen in the absence of that evidence." (*Ibid.*)

Moreover, evidence of the disclosure was presented in general terms without details about the molestation and without naming an alleged abuser, thereby reducing the risk that the jury would consider the evidence for an improper hearsay purpose.[3] (*Brown, supra*, 8 Cal.4th at pp. 760–762 ["So

_____

[3] As part of his argument that admitting evidence of B.C.'s disclosure was prejudicial error because "the gap in time in this case was too long to qualify as a fresh complaint," Flores claims the trial court erroneously instructed the jury that it could consider the statements both to evaluate the witness's testimony *and also* as "evidence that the information in those earlier statements" was true. (See CALCRIM No. 318.) However, Flores has not raised any independent claim of instructional error under a separate argument heading; he mentions it only as part of his prejudice argument for the claimed evidentiary error. Moreover, he presents no developed argument on appeal as to how the instruction affected his substantial rights independent of the alleged evidentiary error. Accordingly, we deem any standalone claim of instructional error to be forfeited. (Cal. Rules of Court, rules 8.204(a)(1)(B) [headings required for each issue], 8.360(a); *Pizarro v.*

long as the evidence that is admitted is carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose, admission of such relevant evidence should assist in enlightening the jury without improperly prejudicing the defendant."].) In these circumstances, the trial court reasonably concluded that B.C.'s disclosure was relevant and admissible under *Brown*.

Having determined that the trial court did not abuse its discretion, we take this opportunity to elaborate on the significance of a delayed disclosure. In *Brown* itself, the court did not specify what if any weight should be given to the fact that the disclosure is delayed in determining its admissibility. On the one hand, the court stated that the timing of the complaint is "not *necessarily* determinative" of its admissibility (*Brown, supra*, 8 Cal.4th at p. 750, italics added), suggesting that delay may at least have some relevance to the admissibility question. On the other hand, the court emphasized that delay is merely one of the factors "to be considered among the circumstances of the victim's report or disclosure that are *relevant in assisting the trier of fact* in assessing the significance of the victim's statements in conjunction with all of the other evidence presented." (*Id*. at p. 763, italics added.) This latter comment suggests that the delayed nature of a disclosure generally

---

*Reynoso* (2017) 10 Cal.App.5th 172, 179 (*Reynoso*) ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading."]; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 (*Meridian*) [a reviewing court "is not required to develop the parties' arguments or search the record for supporting evidence and may instead treat arguments that are not developed or supported by adequate citations to the record as waived"].)

goes to its weight, not its admissibility. In the three decades since *Brown* was decided, no California court has grappled further with this question.

Courts in other jurisdictions significantly differ on how they apply the doctrine—for example, some have freestanding doctrines apart from rules of evidence, others incorporate the doctrine into existing rules, and many courts limit the substance, amount, and purpose of disclosure evidence in various ways. (See *State v. Madigan* (2015) 199 Vt. 211, 227 [122 A.3d 517, 518] [summarizing various approaches].) But there is a growing consensus among courts which have considered evolving jurisprudence and current research that a child victim's delay in disclosing sexual abuse should not affect the admissibility of the disclosure, but should instead be considered by the trier of fact as one factor in evaluating its weight.

In *Commonwealth v. King* (2005) 445 Mass. 217, 230 ([834 N.E.2d 1175, 1189]), the Supreme Judicial Court of Massachusetts recognized that " 'cases involving child sexual abuse constitute a factually distinct branch of the fresh complaint doctrine that gives special consideration to the natural fear, ignorance, and susceptibility to intimidation that is unique to a young child's make-up.' " The court noted that in the past, " '[w]ith regard to child victims, our fresh complaint jurisprudence has adopted the [theory that] a child's circumstances commonly make it difficult, if not impossible, for the child to make a prompt complaint of sexual assault and, contrary to the theoretical justification for the doctrine, a child's much later report of sexual assault is admitted as 'fresh complaint' whenever there is a reasonable explanation for the child's failure to make a prompt complaint.' " (*Ibid.*) Referring to studies on the subject, the court observed that juror misconceptions about the nature of sexual assault "may be particularly strong in child [sexual abuse] cases, as some may attribute allegations of

16

sexual assault to the child's imagination or improper adult influence." (*Id.*, 834 N.E.2d at p. 1195.)

In light of that research, the court in *Commonwealth v. King* rejected delay as a basis for excluding evidence of a victim's disclosure of abuse, doing away with the "fresh complaint" doctrine and replacing it instead with a "first complaint" doctrine. (*Commonwealth v. King, supra*, 834 N.E.2d at pp. 1193–1194, 1197 [limiting admissible testimony to only the first person told of the assault].) The court reasoned that "a requirement of 'promptness' or 'freshness' no longer withstands scrutiny as a cure to the problem of juror stereotyping in cases of sexual assault. To the contrary, it may exacerbate the very misunderstandings the rule aims to counteract—that those victims who report 'freshly' are inherently more credible than those who report at a later time—and contradicts our present understanding that victims often do not promptly report a sexual assault for a variety of reasons that have nothing to do with the validity of the claim of assault." (*Id.*, 834 N.E.2d at p. 1197.) The court further observed that "[a]t worst, the rule rewards perpetrators who are especially brutal or threatening during and after an assault, and thereby successfully procure their victims' prolonged silence." (*Ibid.*) The first complaint doctrine articulated in *Commonwealth v. King* still allows a jury to consider the timing of a complaint as a factor in weighing the victim's testimony, but eliminates delay as a valid basis for excluding evidence of the victim's initial complaint. (*Ibid.*)

Similarly, the Supreme Judicial Court of Maine has applied its own version of the first complaint doctrine to hold that a victim's disclosure statements to his mother at the age of 18 were admissible regarding alleged abuse he suffered four years earlier. (*State v. Fahnley* (Me. 2015) 119 A.3d 727, 731.) After noting that the testimony should be limited to the reported

17

time and place of the assault, the court reasoned that because "a child may be fearful or susceptible to intimidation, or may feel pressure not to tell others about a sexual assault, a child's first complaint may be admitted even if it was not made immediately after the event as long as the child had a reason for not making the complaint contemporaneously with the assault. [Citations.] In the context of this case, and in the absence of an objection, the passage of time between the sexual assault and the victim's complaint to his mother [did] not render the mother's testimony inadmissible under the first complaint rule. Instead, it was for the jury to consider the delay in determining the weight of the evidence to rebut the assumption that, without a complaint, nothing had happened." (*Id.* at pp. 734, 736.)

Connecticut has adopted a similar approach. Its iteration of the fresh complaint doctrine, the "constancy of accusation" doctrine, also permits testimony "only with respect to the fact and timing of the victim's complaint" and strictly limits testimony regarding the details surrounding the assault "to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator." (*State v. Troupe* (1996) 237 Conn. 284, 304 [677 A.2d 917, 928]; but see *State v. Velasquez-Mattos* (2023) 347 Conn. 817, 826, fn. 5 [300 A.3d 583, 589, fn. 5][Connecticut's constancy of accusation doctrine permits disclosure testimony by witnesses other than the victim only if the defense impeaches the victim's credibility " 'regarding any out-of-court complaints or delayed reporting of the alleged sexual assault' "].) In explaining the doctrine, the Supreme Court of Connecticut repeated its prior holding that a complaint "need not have been made promptly after the commission of the alleged offense" for disclosure evidence to be admissible, and that "any delay in reporting is to be considered by the fact finder in

18

evaluating the weight of the constancy of accusation testimony." (*State v. Troupe, supra*, 677 A.2d 925, citing *State v. Parris* (1991) 219 Conn. 283, 291 [592 A.2d 943, 947] [" 'Whatever delay took place between the time of the attack and the time the victim first told witnesses of it does not affect the admissibility of the evidence, but merely presents a question of fact for the trier as to the weight to be given it.' "].)

The Supreme Court of New Jersey has likewise underscored its desire "to dispel the 'timing myth' in proceedings involving the alleged sexual abuse of a child." (*State v. P.H.* (2004) 178 N.J. 378, 394 [840 A.2d 808, 818].)  The court observed that "[w]hen there is no fresh complaint evidence to counteract the misconception that *any* child who suffers abuse would complain at an early opportunity, the jury must be informed that it should not allow misperceptions about 'right' or 'logical' post-assault conduct to infect its assessment of the charges." (*Ibid.*)  The court even posited that "[i]n most cases in which the victim does *not* complain, the trial court if requested by the State should instruct the jury *not* to draw any negative inference from the victim's silence." (*State v. Bethune* (1990) 121 N.J. 137, 149 [578 A.2d 364, 370], italics added.)  In a more recent case, the court reiterated that promptness requirements should be "relaxed when they are applied to juvenile victims[,]" and that children "are given additional time to complain[.]" (*State v. R.K.* (2015) 220 N.J. 444, 455 [106 A.3d 1224, 1231].)

Consistent with these authorities, we likewise conclude that under California's version of this evidentiary rule, a child victim's delay in disclosing sexual assault generally goes to the weight of the disclosure, not its

admissibility.[4] When offered for the limited nonhearsay purpose identified in *Brown*, the victim's disclosure should not be excluded solely because it is not "fresh" enough. Current research and jurisprudence have only reinforced what *Brown* recognized thirty years ago—"that it is not inherently 'natural' " for victims to disclose their abuse immediately, or in many cases, at all. (*Brown, supra,* 8 Cal.4th at p. 758.) As a general rule, therefore, we conclude that relying on the "freshness" of a complaint to determine admissibility "no longer withstands scrutiny," and it is the fact-finder's proper province to consider timeliness in evaluating what weight to accord otherwise relevant disclosure evidence. (*Commonwealth v. King, supra,* 834 N.E.2d at p. 1197.) This approach does not preclude the defense from arguing that a jury should draw negative inferences from an alleged victim's delayed reporting when evaluating whether the offense occurred. (See, e.g., *Brown,* at pp. 761–762 [describing ways a jury might consider evidence of delay in evaluating the likelihood that an offense did or did not occur].)

We recognize that such disclosure evidence is still subject to exclusion under Evidence Code section 352 (*Brown, supra,* 8 Cal.4th at p. 763), and there could conceivably be cases in which the timing and other circumstances of a particular disclosure render it unduly prejudicial even if otherwise relevant. In the usual run of cases, however, an otherwise relevant disclosure should not be excluded merely because it was not made freshly after the sexual assault or assaults.

With this understanding, we also find it appropriate to follow the lead of other jurisdictions by dispensing with the inapt and misleading "fresh

---

4    Although much of our reasoning arguably applies to adult victims of sexual offenses as well, we focus our attention on child victims because that is the only issue presently before us.

complaint" label.  We instead encourage California courts and commentators to refer to this approach as the "prior disclosure" doctrine.

## II

Flores also contends that the trial court improperly admitted Dr. Ward's testimony about CSAAS because B.C. and Y.G. were adults at trial, and "could explain why they may or may not have reported the alleged sexual assaults immediately when they occurred."  We again find no abuse of discretion.

"[I]t has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (See *In re S.C.* (2006) 138 Cal.App.4th 396, 418.)  When a victim's credibility is placed at issue due to "paradoxical behavior, including a delay in reporting," CSAAS testimony is admissible to disabuse a jury of misconceptions about how a child reacts to molestation.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); see also *McAlpin, supra*, 53 Cal.3d at pp. 1300–1301 [acknowledging that the "great majority of courts" approve of admitting expert CSAAS testimony "to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior."].)

Flores attempts to distinguish this long line of cases by contending that CSAAS testimony has "minimal relevance" where the victims testify as adults about events that occurred when they were children.  But none of the cases Flores cites supports his position, and there is case law pointing to the opposite conclusion.

For example, Flores cites to *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*), in which this court addressed whether an expert impermissibly referenced CSAAS for the purpose of proving abuse. (*Id.* at p. 392.) Flores points out that at the time of trial, the victims were still minors. (See *id.* at p. 388 [victims were nine and ten years old in 1985, and the appeal was decided in 1988].) But in concluding that CSAAS testimony should be admitted for a limited purpose, this court did not analyze whether the testimony would lose relevance when the victims testify as adults at trial. Indeed, when providing examples of when CSAAS is proper, we observed that "where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Id.* at p. 394.)

Flores also relies on *In re S.C.*, which involved a dependency petition on behalf of a minor, S.C., alleging that her stepfather sexually abused her. (*In re S.C., supra*, 138 Cal.App.4th at p. 402.) S.C. was still a minor when she testified at trial. (*Id.* at p. 404.) The trial court admitted CSAAS testimony to explain why some child victims "will at some point recant or deny the abuse after they have made their initial disclosure." (*Id.* at p. 418.) In concluding that the trial court did not err in admitting the testimony, the Court of Appeal reiterated that in judicial proceedings "presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*Ibid.*) While Flores points out that *In re S.C.* is a juvenile dependency case and involved the recantation component of CSAAS, he provides no argument as to why that distinction supports his position. And as with *Bowker*, the

22

court did not address whether the expert's testimony would still be proper if S.C. were an adult at the time of trial.

Flores lists several more cases finding that courts properly admitted CSAAS testimony when the victims were still minors at the time of trial. (See, e.g., *Patino, supra*, 26 Cal.App.4th at p. 1740; *People v. Wells* (2004) 118 Cal.App.4th 179, 190 [same].) But none of those cases concluded that CSAAS testimony was only properly admitted *because* the victims were still minors at trial, and in at least some instances, courts have found that CSAAS testimony was admissible even when the victims testified as adults. (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162, 167 [victim was 20 years old at trial and alleged abuse started when victim was 13 or younger]; *People v. Housley* (1992) 6 Cal.App.4th 947, 951 [victim was 18 years old at trial and testified about alleged abuse that happened three years prior].) Flores cites no case law that affirmatively supports his argument that CSAAS becomes irrelevant or inapplicable when individuals victimized as children testify as adults.

Nor does logic lend support to Flores's argument. A victim who suffered sexual abuse as a child does not suddenly become capable of explaining the behavioral and psychological effects of that abuse upon reaching the age of majority. As reflected in the relevant jury instructions, CSAAS testimony is reserved for expert witnesses with the knowledge, skill, and training to provide an informed opinion about the patterns of behavior that may be present in cases involving child sexual abuse. (See Bench Notes to CALCRIM No. 1193 [instructing that CALCRIM No. 332, Expert Witnesses, be given in conjunction with instructions on CSAAS].) Flores provides no explanation for why a victim of child sexual abuse would, upon becoming an adult, possess the specialized knowledge and expertise

23

necessary to explain to a jury how child victims generally respond to such abuse—or even have any meaningful insight into the psychology of her own childhood behavior.

Furthermore, CSAAS testimony was relevant in this case because the defense put the victims' credibility at issue in ways directly related to the CSAAS expert's testimony. (*Bowker, supra*, 203 Cal.App.3d at pp. 393–394 [CSAAS evidence must be targeted to counter a specific myth or misconception suggested by the evidence].) Dr. Ward testified that children often delay disclosure "over many years" because disclosure risks upsetting family dynamics, and that children may only disclose selectively or in a piecemeal manner. During cross-examination, defense counsel asked both victims why they did not report the alleged abuse to their parents or others. He also asked B.C. why she did not disclose all of the alleged incidents at once when given the opportunity. The defense emphasized during closing arguments that the victims did not take advantage of earlier opportunities to report Flores. He also pointed to their failure to disclose the abuse to argue they were not credible.

CSAAS testimony was also relevant to address the defense's theory that the victims were not credible because they showed affection towards Flores. The defense called several witnesses to testify about how both B.C. and Y.G. behaved "normally" around Flores, greeted him with a hug, and attended social events with him. During closing arguments, defense counsel used that testimony to argue that the victims were lying about the allegations because victims of abuse would not interact with their abuser in that way. Dr. Ward testified that the helplessness component of CSAAS includes the fact that children are sometimes required to give affection to adults "they may or may not feel comfortable giving that affection to." She

24

stated that children are often taught to "obey other adults as authority figures[,]" which could explain why victims of abuse might behave in the way B.C. and Y.G. did with Flores.

Additionally, Dr. Ward testified about how traumatic stress impacts memory, explaining that victims of recurring sexual abuse "don't tend to remember every single little detail of every single event that happened[.]" During cross-examination, defense counsel asked both B.C. and Y.G. whether their mother was telling them what to say in court because they each said they had trouble remembering certain details. When Y.G. testified that she did not remember much of her childhood, defense counsel asked her to explain why. When Y.G. struggled to do so and continued to say she could not remember details, defense counsel remarked, "You don't remember. I heard that a lot in this case. I really have." In closing arguments, defense counsel used the victims' incomplete memories to impugn their credibility, providing number counts of how often they said, "I don't know" and "I don't remember." In these ways, the defense placed the victims' credibility at issue using precisely the kind of "paradoxical" behaviors, including delayed reporting, helplessness, and memory repression, that CSAAS testimony is admissible to address. (See *Patino, supra*, 26 Cal.App.4th at pp. 1744–1745.)

Given the relevance of CSAAS testimony in this case, we reject Flores's argument that the testimony's probative value was substantially outweighed by the danger of the jury conflating the testimony with evidence of guilt. (See Evid. Code, § 352.) Dr. Ward testified that while CSAAS is helpful in understanding a child's reactions to abuse, it is not a diagnostic tool used to determine whether or not sexual abuse occurred in a particular case. She further explained that she could only testify generally about how children respond to sexual abuse. The court also instructed the jury with CALCRIM

25

No. 1193, which explained that Dr. Ward's testimony was "not evidence that the defendant committed any of the crimes charged against him[,]" and stated that the jury could "consider this evidence only in deciding whether [B.C.'s] and [Y.G.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [their] testimony." (See *Gonzales, supra*, 16 Cal.App.5th at p. 504 [a reasonable jury "would understand it cannot use [CSAAS] testimony to conclude [the victim] was, in fact, molested."].) That jury instruction and Dr. Ward's own testimony thus reduced the risk of undue prejudice to Flores.[5]

For these reasons, we cannot conclude that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner by allowing Dr. Ward's CSAAS testimony. (See *Goldsmith, supra*, 59 Cal.4th at p. 266.)

III

Lastly, Flores argues that the trial court erred by ruling he is not entitled to presentence conduct credits. Specifically, he contends that the court improperly applied a 2006 amendment to Penal Code section 667.61 which eliminated any reference to presentence conduct credits for offenders

---

[5] Flores acknowledges that CALCRIM No. 1193 has been approved in case law. (See *People v. Munch* (2020) 52 Cal.App.5th 464, 474 [rejecting contention that CALCRIM No. 1193 will lead the jury to improperly use CSAAS testimony to find the defendant is guilty]; *Gonzales, supra*, 16 Cal.App.5th at p. 504 ["A reasonable juror would understand CALCRIM No. 1193 to mean . . . it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested."].) But he argues that the instruction nonetheless "adds to the prejudice associated with" the CSAAS testimony. To the extent he claims the trial court erroneously instructed the jury with CALCRIM No. 1193, Flores has not raised any independent claim of instructional error. Accordingly, as with his argument regarding CALCRIM No. 318, we deem any standalone claim of instructional error to be forfeited. (Cal. Rules of Court, rules 8.204(a)(1)(B) [headings required for each issue], 8.360(a); *Reynoso, supra*, 10 Cal.App.5th at p. 179; *Meridian, supra*, 67 Cal.App.5th at p. 684.)

like Flores.  (Stats. 2006, ch. 337, § 33; see also *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267.)  Before the amendments took effect, Flores would have been eligible for up to a 15 percent conduct credit.  (See *Dearborne*, at pp. 267–268.)

Although the precise dates of Flores's conviction offenses are unclear, we accept the People's concession that because it is *possible* some of the offenses occurred before the relevant amendments were enacted in September 2006, the court should recalculate his conduct credits based on pre-amendment provisions.  (See Stats. 2006, ch. 337, § 33; § 2933.1; see also *People v. Ramirez* (2014) 224 Cal.App.4th 1078, 1086 [the date of the offense determines whether conduct credits are authorized].)  Accordingly, we remand the matter for resentencing.

## DISPOSITION

The trial court's denial of presentence conduct credits is reversed.  The matter is remanded for the trial court to calculate and award presentence conduct credits consistent with this opinion, amend the abstract of judgment accordingly, and submit a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

BUCHANAN, J.

WE CONCUR:


IRION, Acting P. J.


DO, J.

27